Nickie DURAN

v.

**HYUNDAI MOTOR AMERICA, INC. et al.**

Court of Appeals of Tennessee, at Nashville.

Oct. 13, 2006 Session.

Feb. 13, 2008.

Order Denying the Petition for Rehearing Feb. 27, 2008.

Permission to Appeal Denied by Supreme Court Aug. 25, 2008.

Leo Bearman, Jr., Memphis, Tennessee, J. Randolph Bibb, Jr., Nashville, Tennessee, and Ronald S. Range, Jr. and Gary L. Edwards, Johnson City, Tennessee, for the appellants, Hyundai Motor American, Inc., and Hyundai Motor Company.

Wayne A. Ritchie II, Knoxville, Tennessee, and James A. Simmons, Hendersonville, Tennessee, for the appellee, Nickie Duran.

## OPINION

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., J., joined. WILLIAM B. CAIN, J., not participating.

This appeal involves a single vehicle accident in which the driver was seriously injured. The driver filed suit against the manufacturer of the automobile in the Circuit Court for Dickson County, alleging that the automobile's exhaust system was dangerously defective and seeking both compensatory and punitive damages. The jury returned a verdict awarding the driver $3,000,000 in compensatory damages and concluding that the driver was entitled to punitive damages. However, the trial court granted a directed verdict on the punitive damage claim and reduced the jury's award of compensatory damages to $2,000,000 to conform to the driver's amended prayer for relief. On this appeal, the manufacturer takes issue with (1) the admissibility of the evidence regarding punitive damages during the driver's case-in-chief, (2) the scope of the cross-examination of one of its expert witnesses, (3) the trial court's delay in directing a verdict on the driver's punitive damage claim, (4) the jury's allocation of fault, (5) the amount of the compensatory damages award, and (6) the award of discretionary costs. The driv-

er takes issue with the dismissal of her punitive damages claim. We have determined that no error was committed during the trial. In addition, we find that the trial court properly directed a verdict on the driver's punitive damages claim and reduced the award for compensatory damages to $2,000,000. We also find that the verdict, as approved by the trial court, is supported by material evidence. Finally, we have determined that the award for discretionary costs must be reduced.

## I.

Norma Faye Cook owned and operated a greenhouse nursery business in Clarksville, Tennessee. In February 1991, she purchased a 1988 Hyundai Excel from Terry Harris Motor Company in Clarksville. The car was titled in the name of her daughter, Dawn M. Huizar, and was intended for Ms. Huizar's use and for occasional use in the nursery business.

In the Spring of 1992, Ms. Cook was looking for local suppliers of nursery stock because demand for bedding plants and vegetable plants was high. She had been informed that there were several reliable growers in the Dickson area, and so on May 27, 1992, Ms. Cook drove from Clarksville to Dickson to find some of these suppliers. She was driving the 1988 Hyundai Excel on this trip.

Even though she was generally good with directions, Ms. Cook got lost. As she was slowly driving down the rural two-lane roads looking for the growers, she began to smell an odor in the automobile that reminded her of "being behind an 18–wheeler or a Greyhound bus." Ms. Cook assumed that the odor was coming from the surface of the roadway. While her memory of the events from this point on is spotty, Ms. Cook recalls that she had just crested a hill and was going downhill when everything went blank. After Ms. Cook lost consciousness, the Hyundai Excel continued to roll downhill, eventually left the roadway, and struck a tree while traveling between six and twelve miles per hour.

Ms. Cook did not regain consciousness when the automobile struck the tree, and it is unclear how long she was unconscious. By the time Ms. Cook regained consciousness, the entire front end of the Hyundai Excel, including the dashboard, was on fire. Ms. Cook tried to get out of the car but was unable to release the seatbelt. The flames quickly reached Ms. Cook, severely burning her hands and shoulders. She was eventually able to free herself from the seatbelt and crawled out of the burning car.

A passerby who had noticed the fire from a distance found Ms. Cook standing in a yard covered in black residue. After being informed by another bystander that the emergency crews had been called but had not yet responded, the passerby drove Ms. Cook to Goodlark Hospital in Dickson. While Ms. Cook said very little along the way, she told the passerby that she had difficulty getting her seatbelt unfastened and that she had feared that she was going to burn to death.

The staff at Goodlark Hospital determined that Ms. Cook should be transported by ambulance to Vanderbilt University Medical Center. Ms. Cook had second and third degree burns [1] on both her forearms and hands and second degree burns on her face and ears. Her hair was also singed, and she had soot on her tongue.

---

1. Second degree burns are burns that do not go through the full thickness of the skin. While less severe than third degree burns, they are more painful. Third degree burns destroy the skin through its full thickness, thereby providing no basis for regeneration of the skin.

The pain from her burns required high doses of Demerol. For approximately eighteen months, Ms. Cook was required to wear a compression bandage or prosthesis to reduce the thickening of the skin grafts. Vanderbilt's treatment of Ms. Cook's burns proved to be excellent, and Ms. Cook obtained positive cosmetic results.

As serious and painful as the burns were, Ms. Cook sustained an even more serious, long-term inhalation injury[2] from breathing the hot air, smoke, and fumes inside the passenger compartment of the burning car. When she arrived at Vanderbilt, Ms. Cook was covered with soot, she was hoarse, and she was expectorating a great deal of soot. The Vanderbilt physicians determined that she had a burn injury in her upper airway, significant injury to her lungs, and elevated levels of carbon monoxide in her blood.[3] Ms. Cook's throat and trachea were also swollen because of the burns and the loss of oxygen to the cells caused by carbon monoxide poisoning. Accordingly, Ms. Cook was placed on a ventilator for two to three days, and she continued to cough up black sputum and crusty material for days after the incident.

The inhalation injury caused the tissue in Ms. Cook's lungs to deteriorate and die off, thereby impairing the ability of her lungs to produce the oxygen her body required. Ms. Cook was eventually diagnosed with Chronic Obstructive Pulmonary Disease ("COPD"). Her condition placed her among the most impaired lung disease patients. In addition to the daily use of medication and inhalers, Ms. Cook was required to use an oxygen machine twenty-four hours a day to maintain the oxygen levels in her body.

Ms. Cook was an active and healthy fifty year old prior to May 27, 1992. As a result of her injuries, she became "mostly sedentary." She lived with her elderly mother and her ability to carry heavy things—even a bag of groceries—or to walk up and down stairs was extremely limited. She could walk only short distances without becoming winded, and she was unable to take a shower without sitting down. Her treating physician noted that she was now more susceptible to asthma and respiratory infections and that she would require frequent checkups to monitor her condition. He also predicted that her condition would continue to deteriorate and that she would most likely be confined to a wheelchair within five years.

In 1993, Ms. Cook retained counsel and filed suit against Hyundai Motor America, Inc. and others. This suit was eventually dismissed in 1999. Ms. Cook retained new counsel and, on July 3, 2000, filed a second complaint against Hyundai Motor America, Inc. and Hyundai Motor Company (the "Hyundai defendants") and others in the Circuit Court for Dickson County.[4] The complaint included claims based on negligence, the Tennessee Products Liability Act, and the Tennessee Consumer Protection Act and sought up to $8,000,000 in

2. Dr. Kimball I. Maull, an experienced trauma physician, explained that an inhalation injury is not an actual burn of the lung, but rather the inhalation of toxic products into the lung. After reviewing Ms. Cook's medical records, Dr. Maull testified that "she [Ms. Cook] is a textbook example of a patient that sustained a serious inhalation injury."

3. One physician later testified that the levels of carbon monoxide in Ms. Cook's blood were consistent with someone who inhaled enough carbon monoxide to pass out. Another physician called by Hyundai disagreed with this conclusion.

4. Ms. Huizar had died by the time the second complaint was filed. Accordingly, Ms. Cook filed suit on behalf of herself and as the personal representative of Ms. Huizar's estate.

compensatory damages and up to $20,000,000 in punitive damages. The Hyundai defendants filed answers denying liability.

The parties engaged in lengthy discovery but filed no dispositive pre-trial motions of any sort. However, one week before the trial was scheduled to begin, they filed numerous motions in limine. The trial court conducted a pre-trial hearing on May 20, 2005. On the day before trial, Ms. Cook filed a motion to decrease her ad damnum.[5] A jury was empaneled, and the first phase[6] of the trial commenced on May 24, 2005.

During her case in chief, Ms. Cook presented evidence to support her claim that both her unconsciousness and the fire in the engine compartment of the Hyundai Excel had been caused by a defective reed valve subassembly that is designed to bring fresh air into the exhaust system. She also presented evidence intended to prove (1) that the reed valve subassembly was defectively designed and was in a defective and unreasonably dangerous condition on May 27, 1992; (2) that the Hyundai defendants, through their own internal testing, knew as early as April 1990 that fires were occurring in the engine compartment of 1986–1989 Hyundai Excels and that these fires were caused by defects in the design and the materials in the reed valve subassembly; (3) that the Hyundai

defendants decided to issue recall notices only after being pressured by the National Highway Traffic Safety Administration ("NHTSA"); and (4) that the Hyundai defendants did not mail a recall notice to Ms. Huizar until less than two weeks before Ms. Cook was injured on May 27, 1992. In addition, Ms. Cook presented expert medical testimony that her inhalation injuries and her current respiratory condition were caused by her inhaling the hot fumes and smoke in the burning automobile.

At the close of the plaintiff's proof on May 27, 2005, the Hyundai defendants moved for a directed verdict on two matters. First, they asserted that Ms. Cook had failed to prove that the reed valve in her Hyundai Excel was defective or unreasonably dangerous. Second, they asserted that Ms. Cook had failed to present sufficient evidence to warrant submitting her punitive damages claim to the jury. The trial court denied the directed verdict on the issue of liability and, after some equivocation, also declined to direct a verdict on punitive damages.[7]

The evidence that Hyundai presented in defense of Ms. Cook's claims made essentially five points. First, while conceding that there had been problems with the reed valve subassembly in the Hyundai Excel, the Hyundai defendants presented evidence intended to prove that the reed

5. Rather than requesting up to $8,000,000 in compensatory damages, Ms. Cook now requested between $400,000 and $2,000,000 in compensatory damages. She also changed her request for punitive damages from up to $20,000,000 to between $2,000,000 and $10,000,000. She also requested $3,000 for the destruction of the car.

6. Because Ms. Cook was seeking punitive damages, the parties and the trial court agreed that the trial should be bifurcated. During the first phase of the trial, the parties would present evidence regarding (1) liability, (2) damages, and (3) Ms. Cook's entitlement

to punitive damages under the factors in *Hodges v. S.C. Toof,* 833 S.W.2d 896 (Tenn. 1992). If the jury and the court determined that Ms. Cook was entitled to punitive damages, the second phase of the trial would focus on the amount of the punitive damages. *Culbreath v. First Tenn. Bank Nat'l Ass'n,* 44 S.W.3d 518, 527–28 (Tenn.2001).

7. The trial court first granted the Hyundai defendants a direct verdict on punitive damages. However, after Ms. Cook asked the trial court to reconsider its decision, the trial court changed its mind and declined to direct a verdict on her punitive damages claim.

value subassembly in Ms. Cook's car was not in a dangerous or defective condition on May 27, 1992. Second, they presented evidence that the condition of the reed value subassembly could not have caused Ms. Cook to pass out from breathing carbon monoxide fumes. Third, they presented evidence that the fire did not originate in the engine compartment but rather under the automobile following the collision with the tree when the hot catalytic converter came into contact with dry grass. Fourth, they asserted that Ms. Cook had been negligent because she continued to drive the automobile after smelling fumes in the passenger compartment. Finally, they asserted that Ms. Cook's COPD was caused by her smoking,[8] not by her inhalation injuries.

Following the receipt of all the evidence, the Hyundai defendants again moved for a directed verdict on Ms. Cook's punitive damage claim. The trial court denied the motion, and the case went to the jury. On June 1, 2005, the jury returned its verdict. As reflected on its verdict form, the jury found the Hyundai defendants liable on the theories of negligence and strict liability. The jury also found that the Hyundai defendants were 100% at fault and that Ms. Cook was 0% at fault. Accordingly, the jury awarded Ms. Cook $200,000 for past medical expenses, $500,000 for past pain and suffering, $1,150,000 for future pain and suffering, and $1,150,000 for the future loss of ability to enjoy life. In addition, the jury awarded $3,000 for the value of the 1988 Hyundai Excel at the time of the accident. Finally, the jury concluded that Ms. Cook had presented clear and convincing evidence that she was entitled to recover punitive damages from the Hyundai defendants.

The jury's decision that Ms. Cook was entitled to recover punitive damages from the Hyundai defendants portended the second phase of the trial to determine the amount of punitive damages. Before the second phase of the trial could begin, the Hyundai defendants made two oral motions. First, pursuant to Tenn. R. Civ. P. 50.02, they requested a direct verdict on punitive damages in accordance with their earlier motions for direct verdict. Second, they requested the trial court to remit the amount of the jury's compensatory damage award to the amount of compensatory damages requested in Ms. Cook's amended complaint.[9] For her part, Ms. Cook moved to conform her request for damages with the jury's verdict.

The trial court, apparently influenced by the size of the compensatory damages award, decided to direct a verdict on Ms. Cook's punitive damages claim. The court also granted the Hyundai defendants' motion for a remittitur and denied Ms. Cook's motion to conform her request for damages to the jury's verdict. The trial court's decision to direct a verdict for the Hyundai defendants on Ms. Cook's request for punitive damages obviated the need to continue with the second phase of the trial. Accordingly, the trial court dismissed the jury and, on June 8, 2005, filed a judgment awarding Ms. Cook $2,000,000 and awarding Ms. Huizar's estate $3,000.

All parties filed post-trial motions on August 8, 2005. The Hyundai defendants sought a judgment notwithstanding the verdict either on the ground that the verdict lacked evidentiary support or on the

---

8. Ms. Cook conceded that she smoked approximately one package of cigarettes per month prior to the accident and occasionally after the accident.

9. Four days before trial, Ms. Cook amended her complaint to seek up to $2,000,000 in compensatory damages. The jury's award of $3,000,000 in compensatory damages thus exceeded her ad damnum by $1,000,000.

ground that they established a defense to Ms. Cook's claims as a matter of law. In the alternative, they sought a new trial or a remittitur. Ms. Cook filed a motion seeking permission to alter or amend her pretrial motion to decrease the amount of compensatory damages she was seeking. Instead of placing a $2,000,000 cap on these damages, Ms. Cook sought permission to set the cap at $3,000,000. Ms. Cook also requested discretionary costs.

Ms. Cook died on October 19, 2005. On November 7, 2005, the day the trial court heard the parties' post-trial motions, Ms. Cook's lawyer filed a suggestion of death and a motion to substitute Nickie Duran, Ms. Cook's surviving daughter as the plaintiff. On January 9, 2006, the court entered an order (1) approving the verdict of liability as thirteenth juror, (2) approving the $2,000,000 judgment for compensatory damages, (3) denying the Hyundai defendants' motions for a judgment notwithstanding the verdict, new trial, or remittitur, and (4) denying Ms. Cook's motion to amend her original ad damnum clause and to reinstate the jury's $3,000,000 verdict for compensatory damages. The trial court also awarded Ms. Cook $70,584.29 in discretionary costs.

Both parties have raised issues on appeal. Ms. Cook argues that the trial court erred by granting a judgment notwithstanding the verdict on her punitive damage claim. The Hyundai defendants insist that the trial court erred with regard to (1) admitting evidence relating to Ms. Cook's punitive damages claim, (2) allowing the cross-examination of one of its expert witnesses, (3) failing to direct a verdict on Ms. Cook's punitive damage claim at the close of her proof and at the close of all the proof, (4) the jury's failure to assign any fault to Ms. Cook, (5) the amount of the compensatory damage award, and (6) improperly awarding discretionary costs.

The Hyundai defendants also insist that Ms. Cook's death either undermines the compensatory damage award or requires another remittitur.

## II.

### THE HYUNDAI DEFENDANTS' MOTION IN LIMINE TO EXCLUDE EVIDENCE OR ARGUMENT REGARDING MS. COOK'S PUNITIVE DAMAGE CLAIMS

The Hyundai defendants take issue with the trial court's decision to permit counsel for Ms. Cook to include arguments regarding punitive damages in his opening statement and to present evidence during Ms. Cook's case-in-chief regarding her entitlement to punitive damages. They insist that the trial court erred by denying their motion in limine seeking to exclude this argument and evidence. We find two fundamental flaws with this argument. First, the trial court did not deny the Hyundai defendants' motion in limine; it simply acceded to their request to defer the ruling on the motion until the punitive damage phase of the trial. Second, a motion in limine is not the proper vehicle for seeking a dispositive pretrial ruling on a claim for punitive damages.

### A.

The Hyundai defendants did not challenge Ms. Cook's punitive damage claim either with a motion to dismiss or a motion for summary judgment prior to trial. However, on the eve of trial, among their fusillade of pretrial motions was a motion in limine requesting the trial court to [e]xclude "any evidence or argument in support of Plaintiff's claim for punitive damages." They asserted that the trial court should grant this motion because "(1) the undisputed evidence establishes that ... [Ms. Cook] cannot present clear and convincing evidence that the Hyundai Defendants acted with the requisite state of

mind to merit the imposition of punitive damages;[10] and, (2) a punitive damage award in this case would violate the Hyundai Defendants' right to due process under the United States and Tennessee Constitutions."

When the trial court heard the pretrial motions on May 20, 2005, the following exchange between the trial court and the Hyundai defendants' trial counsel occurred:

> MR. BIBB: Your Honor, I would like to take up Motions in Limine No. 10—for some reason they got out of order when we were numbering them, 10, 12, and 13. They all relate to issues relating to punitive damages.
>
> I think, first of all, under the *Hodges* case ... there should be no evidence of the company's net worth or value or money from the Hyundai defendants admitted in all in terms of the prima facie showing—
>
> MR. RITCHIE: No objection.
>
> THE COURT: It would be bifurcated.
>
> MR. BIBB: I thought the court probably would, had we not formally asked for that. I know that is the normal practice here in this state to bifurcate the damages issue.
>
> I think the rest of the issues we can reserve until we get to the—our motion is based on United States Supreme Court decisions, the Gore versus BMW case, the State Farm decision about what elements, what is now to considered for punitive damages, what is the wealth to be considered, extraterritorial

actions to be considered and those sorts of matters.

> I just assume we can defer that. Hopefully, with any luck we won't have to deal with it, but we can take those up before—if in the event we reach punitive damage issues, we would take them up at that time before any evidence is put on.
>
> THE COURT: Fair enough.

As she promised, Ms. Cook did not attempt to present evidence during her case-in-chief regarding the net worth or assets of the Hyundai defendants. She did, however, present a great deal of evidence regarding the Hyundai defendants' knowledge of the allegedly defective reed valve subassembly in the Hyundai Excel and their failure or refusal to take steps to remedy it or to warn the purchasers of the automobile of the problem. This evidence was directed at establishing that the Hyundai defendants had acted recklessly enough to be required to pay punitive damages. The Hyundai defendants never objected to any of this evidence on the ground that it was not proper to present it during the first phase of the trial.

### B.

■ The excerpt from the pre-trial hearing leaves little question about the trial court's ruling on the Hyundai defendants' motion in limine. The court did not deny the motion. Rather, it deferred considering the motion, at the request of the Hyundai defendants' trial counsel, until the second phase of the trial. In accordance with the commitments made during the pretrial conference, Ms. Cook did not at-

---

10. This assertion is based on the Hyundai defendants' claim that the record contained undisputed evidence that the 1988 Hyundai Excel met or exceeded the requirements of the flammability of interior materials and on their assertion that "[t]he evidence does not support a finding that the Hyundai Defendants were aware of a substantial and unjustifiable risk of fire following a collision or [a] fire within the passenger compartment due to any alleged malfunction of the reed valve assembly."

tempt to present evidence regarding the Hyundai defendants' net worth or income. She did present evidence intended to prove that Hyundai had acted intentionally, fraudulently, maliciously, or recklessly with regard to correcting the flaws in the reed valve subassembly and warning its customers of the potential hazards should the reed valve subassembly fail. Hyundai did not object to the introduction of this evidence.

Thus, in addition to the fact that the trial court did not deny Hyundai's motion in limine, we have concluded that the Hyundai defendants are now in no position to complain because they failed to take the steps reasonably available to them during Ms. Cook's case-in-chief to prevent or mitigate the allegedly harmful effects of this evidence. Tenn. R.App. P. 36(a); *State v. Thomas,* 158 S.W.3d 361, 413 (Tenn.2005); *Hessmer v. Hessmer,* 138 S.W.3d 901, 905 (Tenn.Ct.App.2003). They failed to object to the introduction of the evidence they now claim to be unduly prejudicial.

### C.

In addition to the Hyundai defendants' failure to renew their objections to the evidence they now insist was erroneously introduced, there is an even more basic reason to uphold the trial court's denial of the Hyundai defendants' motion in limine. A motion in limine is not the proper vehicle to use to attempt to preclude a claim or defense. It is not equivalent to or a substitute for a motion to dismiss or a motion for summary judgment.

A motion in limine provides a vehicle for requesting guidance from the trial court prior to trial regarding an evidentiary question which the court may provide, at its discretion, to aid the parties in formulating their trial strategy. *Pullum v. Robinette,* 174 S.W.3d 124, 136 n. 12 (Tenn.Ct.App.2004) (quoting *United States v. Luce,* 713 F.2d 1236, 1239 (6th Cir. 1983)); *see also Jones v. Stotts,* 59 F.3d 143, 146 (10th Cir.1995); *Hunt v. K–Mart Corp.,* 294 Mont. 444, 981 P.2d 275, 278 (1999); *see also* 1 *McCormick on Evidence* § 52, at 255–58 (Kenneth S. Brouned., 6th ed. 2006) ("*McCormick on Evidence*"); Neil P. Cohen et al., *Tennessee Law of Evidence* § 1.03[4](f), at 1–20 to 1–21 (5th ed. 2005) ("*Tennessee Law of Evidence*"). It enables the trial court, prior to trial, to exclude anticipated evidence that would clearly be inadmissible for any purpose at trial. *Jonasson v. Lutheran Child & Family Servs.,* 115 F.3d 436, 440 (7th Cir. 1997); *Forsyth County v. Martin,* 279 Ga. 215, 610 S.E.2d 512, 518 (2005). It is, essentially, a substitute for an evidentiary objection at trial. *Premium Cigars Int'l, Ltd. v. Farmer–Butler–Leavitt Ins. Agency,* 208 Ariz. 557, 96 P.3d 555, 570 (Ct.App. 2004).[11]

Motions in limine serve fundamentally different purposes than motions for summary judgment. They are not subject to the same procedural safeguards. *Bradley v. Pittsburgh Bd. of Educ.,* 913 F.2d 1064, 1069–70 (3d Cir.1990). Thus, a motion in limine should not be used as a substitute for a dispositive motion such as a motion for summary judgment.[12] Courts

---

11. If a trial court has not "clearly and definitively" acted on the motion in limine, the moving party must renew the motion contemporaneously with the introduction of the objectionable evidence. Failure to do so precludes the moving party from taking issue on appeal with the admission of the evidence.

*Grandstaff v. Hawks,* 36 S.W.3d 482, 488 (Tenn.Ct.App.2000).

12. *See e.g.,* Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5037.18 (2d ed.2005); Craig Lee Montz, *Trial Objections From Beginning to End: The Handbook for Civil and Criminal*

that have addressed attempts to use a motion in limine in such a manner, either explicitly or implicitly, have found such use to be in error. *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d at 1069–70; *Cannon v. William Chevrolet/Geo, Inc.*, 341 Ill.App.3d 674, 276 Ill.Dec. 593, 794 N.E.2d 843, 849 (2003); *Lin v. Gatehouse Constr. Co.*, 84 Ohio App.3d 96, 616 N.E.2d 519, 524–25 (1992); *BHG, Inc. v. F.A.F., Inc.*, 784 A.2d 884, 886 (R.I.2001). As several courts have noted, a motion in limine should not be used to "choke off" a party's entire claim or defense. *McCracken v. Edward D. Jones & Co.*, 445 N.W.2d 375, 379 (Iowa Ct.App.1989); *Cass Bank & Trust Co. v. Mestman*, 888 S.W.2d 400, 404 (Mo.Ct. App.1994).

 A motion for partial summary judgment is an appropriate way to challenge a claim for punitive damages. *Berenger v. Frink*, 314 N.W.2d 388, 390 (Iowa 1982); *Lundgren v. Eustermann*, 370 N.W.2d 877, 882 (Minn.1985); *see also Chapman v. Jones*, No. M1999–02178–COA–R9–CV, 2000 WL 13793, at *2–4 (Tenn.Ct.App. Jan.10, 2000) (No Tenn. R.App. P. 11 application filed). Rather than testing Ms. Cook's punitive damage claim using a motion for summary judgment, the Hyundai defendants waited until approximately one week before trial to file their motion in limine whose purpose was to choke off Ms. Cook's punitive damage claim by preventing her from introducing the very evidence she would be required to present during the first phase of the trial to establish that she had a right to punitive damages. Had the trial court considered the motion in limine, it would have permitted the Hyundai defendants to skirt the notice and burden of persuasion require-

ments normally associated with summary judgment motions. The Hyundai defendants, however, did not press their motion in limine. Had they done so, the trial court would properly have denied it.

## III.

### THE CROSS-EXAMINATION OF THE HYUNDAI DEFENDANTS' MEDICAL EXPERT REGARDING CARBON MONOXIDE POISONING

The Hyundai defendants take issue with the trial court's decision to permit Ms. Cook's lawyer to cross-examine one of its medical experts regarding his familiarity with the consumer complaints received by the Hyundai defendants about drivers of Hyundai Excels who passed out while driving after smelling smoke or fumes. The Hyundai defendants asserted (1) that this evidence is inadmissible, (2) that it was extremely prejudicial, and (3) that the trial court's limiting instruction was inadequate. We find no reversible error in the cross-examination of the Hyundai defendants' medical expert.

### A.

One of the essential parts of Ms. Cook's case was her assertion that a leak in the exhaust system of the Hyundai Excel filled the passenger compartment with carbon monoxide that caused her to lose consciousness before her automobile struck the tree and burst into flames. The Hyundai defendants responded to this claim by calling Dr. Thomas L. Bennett, a forensic pathologist, to refute Ms. Cook's medical evidence that her carboxyhemoglobin levels after the incident were consistent with her testimony that she blacked out before the automobile hit the tree. On direct

*Trials*, 29 Pepp. L.Rev. 243, 256 (2002) (stating that a motion in limine "may not be used as a substitute for a motion for summary judgment." Even though a motion in limine

may be used to narrow evidentiary issues in advance of trial, it should not be mistaken for a method to dismiss an opponent's claim.).

examination, Dr. Bennett testified unequivocally that "[i]n my opinion, she [Ms. Cook] did not lose consciousness from carbon monoxide fumes prior to striking the tree in the bushes."

Dr. Bennett never examined Ms. Cook. He based his opinion on his experience with carbon monoxide poisoning as a forensic pathologist, his review of Ms. Cook's medical records, several of the depositions that had been taken in the case, and the "literature in the area." The following colloquy between Dr. Bennett and the Hyundai defendants' lawyer during his direct examination illustrates Dr. Bennett's reliance on the "literature":

MR. BIBB: Do you have an opinion within a reasonable degree of medical certainty based on your experience and your review of the literature in this area that someone driving down the road could develop carbon monoxide levels in their blood of 20 to 25 percent in a passenger car even with a leaky exhaust pipe?

DR. BENNETT: Do I have an opinion?

Mr. BIBB: Yes. What is that opinion?

DR. BENNETT: In my opinion—I have never seen it; I have not read about it. I have done literature searches through the National Library of Medicine. I have not come across it. And in the thousands of autopsies and cases I've reviewed, I've never seen it.

On cross-examination, Dr. Bennett reiterated that "[h]er [Ms. Cook's] losing consciousness and driving off the road is not explained by carbon monoxide even at the highest level I can attain." Thus, Dr. Bennett concluded Ms. Bennett's claim that she lost consciousness before the automobile struck a tree is "not medically possible."

The lawyer for the Hyundai defendants sought to drive home Dr. Bennett's opinion

regarding the impossibility of Ms. Cook's claim that she lost consciousness during redirect examination. Part of the discussion included the following:

MR. BIBB: I asked you, did I not, to look to see if there's any reported literature of someone driving down the road and passing out as a result of carbon monoxide poisoning while they're driving along the highway? Did I not?

DR. BENNETT: Yes, you did.

MR. BIBB: Did you search the literature for that?

DR. BENNETT: I did.

MR. BIBB: Did you find any reported case in the medical or scientific literature where someone driving down the road and passed out from carbon monoxide poisoning while the car is in motion?

DR. BENNETT: I looked for that, and I could not find any.

\* \* \*

MR. BIBB: And based on what you've read in this case, the medical records, depositions, trial testimony that you sat through this morning, any indication that you would have ten percent carbon monoxide levels in Ms. Cook's case as she drove down the highway?

DR. BENNETT: No, nothing suggested to me levels that high.

In light of Dr. Bennett's broad characterization of the extent of his literature search, Ms. Cook's lawyer used his redirect examination to inquire more precisely into the scope of Dr. Bennett's search. The following transpired:

MR. RITCHIE: Mr. Bibb asked you about whether you reviewed literature to determine whether it was possible for an individual to pass out from inhaling fumes from an engine compartment, right?

DR. BENNETT: He asked me if I could find any literature where it had been reported that that had occurred.

MR. RITCHIE: Did you review as part of your literature Hyundai medical—Hyundai's—Hyundai Motor America's own documents on the subject?

DR. BENNETT: That would not be in the National Library of Medicine. That would be—

MR. RITCHIE: In Hyundai's possession, wouldn't it?

DR. BENNETT: Yes, sir.

MR. RITCHIE: Well, here, let's just use this.

At this point, the attorney for the Hyundai defendants requested a bench conference. No record of the conference exists. When the bench conference was completed, Ms. Cook's lawyer continued his re-cross examination of Dr. Bennett as follows:

MR. RITCHIE: Dr. Bennett, let me show you Hyundai Motor America National Headquarters Consumer Affairs Open Concern Processing Report dated January 11, 1991.

MR. BIBB: May I interpose an objection, Your Honor, for the reason stated at the sidebar that we didn't get on the record. I'll need to make a record of that at some point.

MR. RITCHIE: "Customer's mother called to say he had a fire in his car and it blew up. This occurred on early—July 7, 1990. No fire insurance. Customer states he smelled smoke, saw flames and woke up on the side of the road. No injury, but he's passed out supposedly from smoke."

Ever seen that document before?

DR. BENNETT: No, sir. That wouldn't be something that would show up in the National Library of Medicine because it is not peer reviewed by anybody.

MR. RITCHIE: Oh, I understand. I understand. Do you know if Hyundai ever investigated this claim?

DR. BENNETT: I have no knowledge of that.

The trial court stopped the questioning at that point and gave the jury the following limiting instruction:

THE COURT: Ladies and gentlemen, this is being admitted just as cross-examination of this witness. That was based on a call that came in to Hyundai. You may consider what he's putting up there [13] as—for the truth of the matter that is asserted. Does everyone understand that?

Just because the call came in, it is unverified, and you can't consider it for the truth of that statement.

Thereafter, Ms. Cook's lawyer resumed his questioning of Dr. Bennett as follows:

MR. RITCHIE: Document from the National Highway Traffic Safety Administration, a report that was forwarded to Hyundai concerning an Excel model 1988, "While driving temperature gauge when up, smelled gas fumes inside car, occupants passed out, car caught on fire."

Did I read that correctly?

DR. BENNETT: It looks like it, yes, sir.

MR. RITCHIE: So I guess you would be of the opinion that that is impossible for that to happen too?

DR. BENNETT: No, sir. I think that is a statement of someone. It's—

13. The trial court's reference to "putting up" the document refers to the fact that Ms. Cook's lawyer was projecting the telephone message on a video screen for the jury to read.

what else went on? What speeds? They woke up. What else happened? That's—I'm not saying that's impossible; I'm just saying that is so incomplete to be meaningless basically at this point until it's investigated fully.

MR. RITCHIE: The only investigation you have done into this case is reviewed some medical records, right?

DR. BENNETT: Medical records, statements, depositions, everything we have discussed here. But medical records primarily.

MR. RITCHIE: Thank you, Dr. Bennett.

Following Dr. Bennett's testimony, Ms. Cook's lawyer attempted to introduce copies of the two consumer complaints into evidence. The trial court denied the request.

**B.**

The Hyundai defendants insist that the trial court erred by permitting Ms. Cook's lawyer to cross-examine Dr. Bennett regarding his knowledge of complaints they had received regarding drivers who had passed out after smelling fumes inside their automobiles. They insist that these complaints were not learned treatises and, therefore, that using them for impeachment purposes violated Tenn. R. Evid. 618. We have determined that the trial court did not err by permitting Ms. Cook's lawyer to question Dr. Bennett regarding his knowledge of reports that other drivers of Hyundai Excels passed out after smelling fumes.

The record on appeal confirms that the Hyundai defendants objected to this line of cross-examination. However, it does not indicate what the specific ground for the objection was, and the ground for the objection is not apparent from the context.[14] Lawyers are expected to make prompt and specific objections when their adversaries attempt to introduce objectionable evidence. Tenn. R. Evid. 103(a)(1); *Rogers v. Hollingsworth*, 95 Tenn. 357, 359, 32 S.W. 197, 198 (1895); *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 702 (1999). Doing so enables the trial court to understand and respond appropriately to the objection. 1 *McCormick on Evidence* § 52, at 258. It also provides the adversary with an opportunity to remedy the defect and a proper record for the reviewing court in the event of an appeal. *Middle Tenn. R.R. v. McMillan*, 134 Tenn. 490, 507–08, 184 S.W. 20, 24 (1916); *Ingram v. Smith*, 38 Tenn. (1 Head) 411, 418 (1858); 1 *McCormick on Evidence* § 52, at 258–59. Parties challenging the admissibility of evidence are generally not permitted to raise the issue on appeal when the record does not show that a timely objection was made and the specific basis for that objection. Tenn. R. Evid. 103(a)(1); *Welch v. Bd. of Prof'l Responsibility*, 193 S.W.3d 457, 464 (Tenn.2006); *Tire Shredders, Inc. v. ERM–North Cent., Inc.*, 15 S.W.3d 849, 864 (Tenn.Ct.App.1999).

Despite the lack of specificity in the record regarding the basis of the Hyundai defendants' objection to the cross-examination of Dr. Bennett, we have decided to address the issues the Hyundai defendants

---

**14.** Even the Hyundai defendants' motion for new trial does not specify the grounds of this objection. However, in their memorandum of law in support of their motion, the Hyundai defendants argued, without a specific citation to the Tennessee Rules of Evidence, (1) that these consumer complaints were not "medical or scientific literature," (2) that the complaints were "nothing more than unverified hearsay," (3) that these questions enabled Ms. Cook to introduce evidence of similar incidents that had already been excluded by the trial court, and (4) that the prejudice caused to the Hyundai defendants far outweighed the probative value of these questions and answers.

have raised on appeal. As we understand their arguments, the Hyundai defendants are now asserting: (1) that Tenn. R. Evid. 618 required the cross-examination of Dr. Bennett to be limited to learned treatises and that the consumer complaints were not learned treatises; (2) that the statements in the consumer complaints should have been excluded as hearsay under Tenn. R. Evid. 802; and (3) that the consumer complaints were nothing more than evidence of similar incidents that had already been excluded under Tenn. R. Evid. 403.

### C.

██ We turn first to the Hyundai defendants' contention that questioning Dr. Bennett regarding his knowledge of consumer complaints about drivers passing out after smelling fumes violated Tenn. R. Evid. 618 because these complaints were not learned treatises. The Hyundai defendants called Dr. Bennett as a causation expert. His testimony was intended to refute Ms. Cook's evidence that a carbon monoxide leak in her automobile's exhaust system caused her to pass out before her automobile struck the tree.

Dr. Bennett qualified himself as an expert regarding carbon monoxide poisoning. Then, with regard to the specific issue in the case, he described the materials upon which his expert opinion was based, including the materials that the Hyundai defendants had provided to him. He stated that he had reviewed the "medical or scientific literature" at the Hyundai defendants' request and that he could not find any reported cases of someone driving down the road and passing out as a result of carbon monoxide poisoning while the car was in motion. He also testified that it was "not medically possible" for Ms. Cook to have lost consciousness before her automobile struck the tree.

Had Dr. Bennett's testimony been limited to his conclusion that there is no reported case in the medical or scientific literature of a person who became unconscious as a result of carbon monoxide poisoning while driving a vehicle, Tenn. R. Evid. 618 may very well have limited the scope of cross-examination to questioning Dr. Bennett about articles or case studies in the medical or scientific literature that he had overlooked. However, Dr. Bennett's opinion went far beyond a simple report of the medical or scientific literature. He testified, without equivocation, that it was "not medically possible" for Ms. Cook to have lost consciousness.

Dr. Bennett's opinion that it was not medically possible for Ms. Cook to have lost consciousness was not based solely on his review of the medical and scientific literature. It was based on his entire experience as a forensic pathologist and, particularly, on his experience with persons who have inhaled smoke and fumes during a fire, and on the data and information provided by the Hyundai defendants. Accordingly, the trial court properly permitted Ms. Cook's attorney to cross-examine Dr. Bennett regarding the basis for his opinion, and this cross-examination was not limited to impeaching Dr. Bennett using learned treatises under Tenn. R. Evid. 618.

Experts may base their opinions on information provided to them by others, Tenn. R. Evid. 703, and they are not required to disclose the facts or data upon which their opinion is based before doing so. Tenn. R. Evid. 705. However, once an expert has given an opinion, he or she may be vigorously cross-examined to undermine the evidentiary weight of the opinion. *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 275 (Tenn.2005); *Johnson v. John Hancock Funds*, 217 S.W.3d 414, 426 (Tenn.Ct.App.2006). Opposing counsel

should be given broad latitude in their cross-examination. *State v. Farner*, 66 S.W.3d 188, 208 (Tenn.2001); *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn.1997). Thus, cross-examination may be used to require an expert to disclose and explain the facts or data upon which his or her opinion is based. Tenn. R. Evid. 705; *State v. Thacker*, 164 S.W.3d 208, 228 (Tenn.2005). Just as an expert may be cross-examined regarding the facts or data he or she considered, an expert may be also be cross-examined regarding the facts or data that he or she did not consider and the reasons for not considering these facts or data.

Based on the context of Dr. Bennett's testimony, we have concluded that Ms. Cook's attorney was not attempting to impeach Dr. Bennett's testimony with a learned treatise during his cross-examination. Rather, he was inquiring into the factual basis for Dr. Bennett's assertion that it was medically impossible for a driver to lose consciousness while driving a moving automobile. Dr. Bennett emphasized the amount of information that the Hyundai defendants had provided him. It was, therefore, appropriate to ask him about other available facts or data that the Hyundai defendants did not provide him. Accordingly, we decline to find that the cross-examination of Dr. Bennett violated Tenn. R. Evid. 618.

### D.

▌ The Hyundai defendants also insist that the trial court's decision to permit Ms. Cook's lawyer to cross-examine Dr. Bennett about the two consumer complaints enabled Ms. Cook to introduce through the back door evidence that she could not introduce through the front door. They insist that the trial court's decision regarding the cross-examination of Dr. Bennett is inconsistent with its earlier ruling prohibiting Ms. Cook from introducing evidence of prior similar incidents to prove that the Hyundai defendants knew or should have known of the dangerous condition created by the Hyundai Excel's reed valve subassembly. We disagree.

▌ Evidence of prior accidents is admissible to prove the existence of a dangerous condition or to prove the defendant's knowledge of the dangerous condition. *John Gerber Co. v. Smith*, 150 Tenn. 255, 266, 263 S.W. 974, 977 (1924); *Winfree v. Coca–Cola Bottling Works*, 19 Tenn. App. 144, 147, 83 S.W.2d 903, 905 (1935); *Ellis v. Memphis Cotton Oil Co.*, 3 Tenn. Civ.App. (Higgins) 642, 650 (1913). However, if the evidence of prior accidents is being offered to prove the existence of a particular hazard or danger, the party seeking to introduce the evidence must lay a foundation establishing substantial similarity between the present accident and the prior accident. *John Gerber Co. v. Smith*, 150 Tenn. at 268, 263 S.W. at 977. While all evidence relevant to the determination of disputed factual issues is generally admissible at trial, Tenn. R. Evid. 402, evidence concerning prior accidents that does not satisfy the substantial similarity requirement is inadmissible under Tenn. R. Evid. 403. *Stroming v. Houston's Rest., Inc.*, No. 01A01–9304–CV–00189, 1994 WL 658542, at *3 (Tenn.Ct.App. Nov.23, 1994) (No Tenn. R.App. P. 11 application filed).

The manner in which Dr. Bennett was cross-examined regarding his knowledge of consumer complaints to the Hyundai defendants does not substantiate the Hyundai defendants' claim that Ms. Cook was permitted to introduce evidence of prior accidents to establish the Hyundai defendants' knowledge of the allegedly dangerous condition of the reed valve subassembly. Viewed in context, the purpose of the cross-examination of Dr. Bennett was to

test the evidentiary support for his unequivocal assertion that Ms. Cook's claim that she passed out because of a carbon monoxide leak in her automobile's exhaust system was "not medically possible." We find no error in the trial court permitting Ms. Cook's lawyer to ask Dr. Bennett if he was aware that other drivers had complained to the Hyundai defendants that they had lost consciousness after smelling fumes.

### E.

In addition, the Hyundai defendants assert that the trial court's limiting instructions regarding the jury's consideration of the two consumer complaints were insufficient to mitigate the prejudicial nature of the mention of the complaints. They insist the content of these complaints is hearsay and that permitting Ms. Cook's lawyer to read the complaints to Dr. Bennett was irremediably prejudicial. We disagree.

When evidence is admissible for one purpose but not for another, it is commonplace for trial courts to give a contemporaneous limiting instruction that explains the proper use of the evidence to the jury. *See, e.g., State v. Dutton,* 896 S.W.2d 114, 116 (Tenn.1995) (trial courts should provide limiting instructions when the evidence is offered for a limited use). While Tenn. R. Evid. 105 requires trial courts to give a limiting instruction when requested, trial courts may also provide limiting instructions on their own motion. *Tennessee Law of Evidence* § 1.05[4], at 1–42. Parties who are dissatisfied with a limiting instruction should share their concern with the trial court. *See Mercer v. Vanderbilt Univ., Inc.,* 134 S.W.3d 121, 135 (Tenn.2004).

The cross-examination of Dr. Bennett was not the first time during the trial that the jurors heard testimony regarding consumer complaints about the Hyundai Excel. During questioning by the Hyundai defendants' lawyer during Ms. Cook's case-in-chief, the Hyundai Defendants' Director of Engineering and Design Analysis testified that 837,836 Hyundai Excels had been sold in the United States during the model years from 1986 through 1989 and that the National Highway Traffic Safety Administration and the Hyundai defendants had received a total of 49 failure reports regarding these vehicles.

There is no question that the substance of the two consumer complaints is hearsay. There is likewise no question that the trial court's limiting instruction could have been more artfully worded. However, at least as far as the record shows, the Hyundai defendants did not object to either the substance of the limiting instruction or insist that the evidence regarding the two consumer complaints was so prejudicial that it should have been excluded under Tenn. R. Evid. 403. After considering the trial court's limiting instruction in context, we have determined that it conveyed to the members of the jury an understanding that they should not take the substance of the consumer complaints as true. We have also determined that the questions asked by Ms. Cook's attorney, when considered in light of Dr. Bennett's answers and the earlier introduction of evidence regarding the failure reports involving the Hyundai Excel, was not so prejudicial that it should have been excluded.

### F.

Decisions regarding the admissibility of testimony and other evidence rest in the trial court's sound discretion. *State v. Lewis,* 235 S.W.3d 136, 141 (Tenn. 2007); *Mercer v. Vanderbilt Univ., Inc.,* 134 S.W.3d at 131; *Tire Shredders, Inc. v. ERM–North Cent., Inc.,* 15 S.W.3d at 858. Accordingly, appellate courts review these

decisions using the "abuse of discretion" standard. *Biscan v. Brown,* 160 S.W.3d 462, 468 (Tenn.2005); *Palanki ex rel. Palanki v. Vanderbilt Univ.,* 215 S.W.3d 380, 390 (Tenn.Ct.App.2006). This standard implicitly recognizes the existence of a range of permissible alternatives. *State ex rel. Jones v. Looper,* 86 S.W.3d 189, 193–94 (Tenn.Ct.App.2000). It is intended to be a review-constraining concept implying less intense appellate review and, therefore, less likelihood of reversal. *In re Estate of Greenamyre,* 219 S.W.3d 877, 885 (Tenn. Ct.App.2005); *Johnson v. Nissan N. Am., Inc.,* 146 S.W.3d 600, 604 (Tenn.Ct.App. 2004).

Based on our review of the record, we have determined that the trial court acted within its discretion when it permitted Ms. Cook's lawyer to cross-examine Dr. Bennett regarding his awareness of consumer complaints received by the Hyundai defendants regarding drivers of Hyundai Excels who claimed they passed out while driving after smelling fumes. We have also determined that the trial court acted within its discretion by giving a limiting instruction regarding the proper use of this evidence. Accordingly, we decline to find that the trial court committed reversible error with regard to the cross-examination of Dr. Bennett.

## IV.

### The Timing of the Trial Court's Denial of the Hyundai Defendants' Motions for Directed Verdict on Ms. Cook's Punitive Damage Claim

The Hyundai defendants assert that the trial court erred by denying their motions requesting the trial court to direct a verdict on Ms. Cook's punitive damage claim. They assert that Ms. Cook did not present sufficient evidence during her case-in-chief to support her claim for punitive damages. They also assert that the trial court's fail-ure to direct a verdict on the punitive damage claim before the case was submitted to the jury resulted in the jury's hearing evidence and argument that improperly influenced the jury's decisions regarding liability and compensatory damages. We have determined that the trial court did not err when it denied the Hyundai defendants' motions for a directed verdict on Ms. Cook's punitive damage claim before the case was submitted to the jury.

### A.

Ms. Cook presented evidence during her case-in-chief designed to support her claim that she should be entitled to recover punitive damages from the Hyundai defendants because of their reckless disregard for the safety of their customers and the public. According to Ms. Cook, the Hyundai defendants delayed starting their own internal investigation into reports of engine compartment fires in the Hyundai Excel and denied the existence of safety problems with the reed value subassembly when they received inquiries from NHTSA even though they had known since April 1990 of a specific defect in the reed valve subassembly. Ms. Cook also presented evidence intended to show that the Hyundai defendants unreasonably delayed issuing recall notices after they had agreed with NHTSA to do so.

The Hyundai defendants moved for a directed verdict on Ms. Cook's punitive damages claim at the conclusion of her case-in-chief. The trial court initially decided to grant the directed verdict, reasoning as follows:

The proof in this case has not been that they were aware of a substantial and unjustifiable risk of injury, damage, that the Highway Safety Administration's pamphlets and documents and letters that have been entered basically say, we think you have a problem, not

that you definitely have a problem, but we think you have a problem, and then there's documents going back and forth.

So I don't think—as far as this being an egregious case, to Ms. Cook it's an egregious case. I don't think it's egregious enough with sufficient proof that Hyundai was sufficiently aware of the risk and disregarded the risk; therefore, I'm going to direct the verdict on the punitive damages issue.

Following further argument by counsel for both parties, the trial court observed that it had concluded that both the Hyundai defendants and NHTSA had "drug their feet." [15] Before taking a recess, the trial court expressed its belief that the ruling on the Hyundai defendants' motion for directed verdict was correct but then added "I didn't say I liked it."

The trial court called a recess after the Hyundai defendants presented their first witness. The court informed the parties at that time that it had decided to reverse its earlier decision to direct a verdict on Ms. Cook's punitive damages claim. The court explained that its experience had primarily been prosecuting criminals and presiding over criminal trials and that it had read an opinion during the lunch recess in which an appellate court had reversed a trial court's decision to direct a verdict on a punitive damages claim.[16] The court stated that "reasonable persons could differ whether or not they've established that by clear and convincing evidence. I'm reversing myself on the directed verdict on punitive damages."

The Hyundai defendants renewed their motion to direct a verdict on Ms. Cook's punitive damage claim at the close of all the proof. They insisted that Ms. Cook had failed to present clear and convincing evidence that they had been reckless. The trial court denied the motion, stating:

> Well, one thing we know from [the] Lumberman's [sic] case, *Hughes v. Lumberman's* [sic], is if I don't charge punitive damages to the jury, it's going to come back. If I do charge punitive damages and a jury returns punitive damages against Hyundai, it can be fixed if I'm wrong. So if I'm going to err, I'm going to err on the side of charging punitive damages.

After the jury returned a verdict finding that Ms. Cook was entitled to punitive damages, the Hyundai defendants moved for a judgment in accordance with their earlier motions for directed verdict. Despite the fact that no new evidence regarding punitive damages had been entered since its denial of the motion for directed verdict at the close of the plaintiff's proof, the trial court granted the motion. The court explained:

> I'm convinced the jury considered punitive damages in awarding this amount of damages. The court doesn't feel, even though that under that Lumberman case reasonable minds differ, it should be submitted to the jury.
>
> This court is just not under the impression that this is a most egregious case, and the clear and convincing evidence ... supports the proposition that there's no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

---

**15.** The trial court stated, "Well, the court is still of the opinion that that evidence does arise to the level of gross deviation. It shows they drug their feet." The court immediately clarified that its reference to "they" included NHTSA.

**16.** The trial court was referring to *Hughes v. Lumbermens Mut. Cas. Co.*, 2 S.W.3d 218 (Tenn.Ct.App.1999).

So I'm going to direct the verdict as to punitive damages and remit the award to the ad damnum asked for by the plaintiffs.

The court added:

I thought I was correct when I initially ruled on my directed verdict. When I read that other case, I had some doubt. But I'm convinced that a directed verdict on the punitive damages is a correct decision. That's what I'm going to do.

### B.

We have already determined in Section II that the trial court did not err by denying the Hyundai defendants' motion in limine seeking to prevent Ms. Cook from presenting evidence or argument regarding her claim for punitive damages. We now turn our attention to whether the trial court erred by failing to grant the Hyundai defendants' motion for directed verdict on Ms. Cook's punitive damage claim at the close of her case-in-chief and at the close of all the evidence.

Despite the fact that the trial court eventually granted their post-verdict motion for a judgment in accordance with their motion for directed verdict, the Hyundai defendants assert that the trial court erred by delaying its decision until after the jury returned a verdict. Characterizing the trial court's response to their motions for directed verdict as "playing the odds," they insist that they were somehow entitled to a directed verdict at the earliest point in the case when granting a directed verdict would have been warranted. The Hyundai defendants, however, cite no legal authority for this contention.

Tenn. R. Civ. P. 50.01 permits trial courts to grant a directed verdict at the close of the plaintiff's case. It does not, however, require a trial court to grant a directed verdict at that time, even though it might be appropriate to do so. *See* 9B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2533, at 515–20 (3d ed. 2008) (*"Federal Practice and Procedure"*).[17] In fact, many courts have observed that it may be a better and safer practice to defer ruling on a motion for directed verdict until both sides have finally rested. *See e.g., United States v. Vahlco Corp.,* 720 F.2d 885, 889 (5th Cir. 1983); *Mattivi v. S. Afr. Marine Corp.,* 618 F.2d 163, 166 n. 2 (2d Cir.1980); *Guess v. Baltimore & O.R. Co.,* 191 F.2d 976, 980 (8th Cir.1951).

With regard to motions for directed verdict filed at the close of all the evidence, Tenn. R. Civ. P. 50.02 plainly anticipates that the trial court may decide to defer ruling on the motion for directed verdict until after the jury returns its verdict. Courts construing the Tenn. R. Civ. P. 50.02's federal counterpart have noted that all but the plainest cases should be submitted to the jury. *Therrell v. Ga. Marble Holdings Corp.,* 960 F.2d 1555, 1569 (11th Cir.1992); *Colonial Lincoln–Mercury, Inc. v. Musgrave,* 749 F.2d 1092, 1098 n. 3 (4th Cir.1984). Accordingly, appellate courts have stated repeatedly that it is usually desirable to take a verdict and then pass on the sufficiency of the evidence on a post-verdict motion. *Unitherm Food Sys., Inc. v. Swift–Eckrich, Inc.,* 546 U.S. 394, 405–06, 126 S.Ct. 980, 988, 163 L.Ed.2d 974 (2006); *Gomez v. St. Jude Med. Daig Div.,*

17. While Tenn. R. Civ. P. 50 is not an exact replica of Fed.R.Civ.P. 50, it was modeled after and continues to mirror the federal rule. Accordingly, the federal courts' interpretations of Fed.R.Civ.P. 50 provide helpful guidance for our construction of Tenn. R. Civ. P.

50. *Frazier v. E. Tenn. Baptist Hosp.,* 55 S.W.3d 925, 929 (Tenn.2001); *Harris v. Chern,* 33 S.W.3d 741, 745 n. 2 (Tenn.2000); *Byrd v. Hall,* 847 S.W.2d 208, 211 n. 2 (Tenn. 1993); *Nagarajan v. Terry,* 151 S.W.3d 166, 175 n. 12 (Tenn.Ct.App.2003).

*Inc.*, 442 F.3d 919, 938 (5th Cir.2006); *Bergstrom–Ek v. Best Oil Co.*, 153 F.3d 851, 859 n. 3 (8th Cir.1998).[18]

The trial court took a cautious approach to the Hyundai defendants' pre-verdict motions for directed verdict. While it had doubts regarding the sufficiency of Ms. Cook's evidence regarding her claim for punitive damages, the court decided to avoid the risk of a second trial by permitting the jury to consider whether Ms. Cook had demonstrated that she was entitled to recover punitive damages. Such a cautious approach is advisable in close cases. *See Tackett v. Kidder*, 616 F.2d 1050, 1052 (8th Cir.1980); *Chicago, Rock Island & Pac. R.R. Co. v. Breckenridge*, 333 F.2d 990, 991 (8th Cir.1964). Accordingly, we decline to hold that the trial court erred by not granting the Hyundai defendants' motions for directed verdict made at the close of Ms. Cook's case-in-chief and at the close of all the evidence.

### C.

The Hyundai defendants also assert that their motions for directed verdict took on added importance because they were aimed at Ms. Cook's claim for punitive damages. They insist that the trial court's failure to grant their motions tainted the jury's consideration of Ms. Cook's compensatory damages claims by exposing the jurors to prejudicial arguments and evidence that would not have been permitted

had the trial court directed a verdict on Ms. Cook's punitive damages claim. We find little merit in this argument.

While circumstances may arise that will call for granting a directed verdict early in a proceeding, the burden is squarely on the moving party to demonstrate to the trial court with some specificity why the directed verdict should be granted and the prejudice that will be caused if it is not. Even though the Hyundai defendants' brief discusses at some length the prejudice resulting from the trial court's denial of their post-verdict motions for directed verdicts, we find no indication in the record that they ever explained to the trial court that permitting evidence and argument relating to Ms. Cook's punitive damages claim could adversely and inappropriately affect the jury's consideration of liability and its calculation of compensatory damages.

Two other considerations undermine the force of the Hyundai defendants' argument. First, most of the evidence and argument that the Hyundai defendants deem to be inappropriately prejudicial was presented before Ms. Cook closed her case-in-chief. Thus, the prejudicial bell had already been rung by the time the Hyundai defendants moved for a directed verdict at the close of Ms. Cook's case-in-chief. Second, we have concluded that the evidence regarding the Hyundai defen-

---

**18.** The rationale for permitting a jury to return a verdict before acting on a motion for directed verdict has been explained as follows:

> If judgment as a matter of law is granted and the appellate court holds that the evidence in fact was sufficient to go to the jury, an entire new trial must be had. If, on the other hand, the trial judge submits the case to the jury, even though he or she thinks the evidence insufficient, final determination of the case is expedited greatly. If the jury agrees with the trial court's ap-

> praisal of the evidence, and returns a verdict for the party who moved for a judgment as a matter of law, the case is at an end. If the jury brings in a different verdict, the trial court can grant a renewed motion for judgment as a matter of law. Then, if the appellate court holds that the trial court was in error in its appraisal of the evidence, it can reverse and order judgment on the verdict of the jury, without any need for a new trial.

> 9B *Federal Practice and Procedure* § 2533, at 516–17.

dants' alleged recklessness that they believe to be so prejudicial would have been admissible to prove Ms. Cook's negligence claim even if she had not been seeking punitive damages.[19]

## V.

### THE JURY'S ALLOCATION OF FAULT

The Hyundai defendants also take issue with the jury's allocation of fault. In light of Ms. Cook's testimony that she continued to operate her automobile after smelling odors, they assert that the record lacks material evidence to support the jury's decision that they were completely at fault while Ms. Cook was completely without fault. We have determined that the record contains material evidence to support the jury's allocation of one hundred percent of the fault to the Hyundai defendants.

### A.

 Fault allocations do not differ substantively from the other sorts of factual determinations that juries routinely make. *Henley v. Amacher*, No. M1999–02799–COA–R3–CV, 2002 WL 100402, at *10 (Tenn.Ct.App. Jan. 28, 2002) (No Tenn. R.App. P. 11 application filed). With the constitutional dimension of the right to a jury trial framing the appellate process, Tenn. R.App. P. 13(d) narrowly limits the role of appellate courts in reviewing such findings. When the factual foundation of a jury's verdict is challenged, we may only set aside the verdict when there is no material evidence to support it.

 Challenging a jury's allocation of fault is the legal equivalent of a "Hail Mary" pass. *Braswell v. Lowe's Home*

*Ctrs., Inc.*, 173 S.W.3d 41, 43 (Tenn.Ct. App.2005). The comparison and allocation of fault is for the jury, *Prince v. St. Thomas Hosp.*, 945 S.W.2d 731, 735–36 (Tenn. Ct.App.1996), and appellate courts will not second-guess a jury's allocation of fault if it is supported by any material evidence. *Dunn v. Davis*, No. W2006–00251–COA–R3–CV, 2007 WL 674652, at *4 (Tenn.Ct. App. Mar.6, 2007) (No Tenn. R.App. P. 11 application filed). The process of ascertaining whether evidentiary support exists for a jury's verdict is very deferential toward the verdict. *Barrett v. Vann*, No. E2006–01283–COA–R3–CV, 2007 WL 2438025, at * 11 (Tenn.Ct.App. Aug.29, 2007) (No Tenn. R.App. P. 11 application filed); *Ballard v. Serodino, Inc.*, No. E2004–02656–COA–R3–CV, 2005 WL 2860279, at *3 (Tenn.Ct.App. Oct.31, 2005) (No Tenn. R.App. P. 11 application filed). Reviewing courts must (1) take the strongest legitimate view of the evidence that favors the verdict, (2) assume the truth of all the evidence that supports the verdict, and (3) allow all reasonable inferences that sustain the verdict. *Braswell v. Lowe's Home Ctrs., Inc.*, 173 S.W.3d at 43; *Kelley v. Johns*, 96 S.W.3d 189, 194 (Tenn.Ct.App. 2002). In the rare circumstance when the record contains no material evidence to support a jury's allocation of fault, the only recourse is to vacate the judgment and remand the case for a new trial. *Jones v. Idles*, 114 S.W.3d 911, 914–15 (Tenn.2003); *Hodge v. State*, No. M2004–00137–COA–R3–CV, 2006 WL 36905, at* 5 n. 3 (Tenn. Ct.App. Jan. 5, 2006) (No Tenn. R.App. P. 11 application filed).

 When appellate courts review the evidentiary foundation of a jury's verdict regarding liability, they should keep in

19. The trial court even noted in ruling upon post-trial motions that "if I was wrong by not granting the directed verdict [earlier] and permitting it to go to the jury, I don't think the argument of counsel went outside the bounds of anything I would have allowed him to argue either way."

mind that the Constitution of Tennessee assigns this task to the jury. *Smith v. Sloan*, 189 Tenn. 368, 374, 225 S.W.2d 539, 541 (1949); *Jackson v. B. Lowenstein & Bros., Inc.*, 175 Tenn. 535, 538, 136 S.W.2d 495, 496 (1940). Appellate courts are not a jury of three with the prerogative to re-weigh the evidence, *Whaley v. Rheem Mfg. Co.*, 900 S.W.2d 296, 300 (Tenn.Ct.App. 1995); *Lowe v. Preferred Truck Leasing, Inc.*, 528 S.W.2d 38, 41 (Tenn.Ct.App. 1975), or to determine where the "truth" lies. *D.M. Rose & Co. v. Snyder*, 185 Tenn. 499, 508, 206 S.W.2d 897, 901 (1947); *Davis v. Wilson*, 522 S.W.2d 872, 875 (Tenn.Ct.App.1974). Nor are they empow-ered to substitute their judgment for the jury's, *Grissom v. Modine Mfg. Co.*, 581 S.W.2d 651, 652 (Tenn.Ct.App.1978), even if they conclude that the evidence might well have supported a different conclu-sion,[20] or that the jury did not weigh the evidence well[21] or that they would have reached a different conclusion had they been members of the jury.[22]

### B.

The Hyundai defendants essen-tially contend that Ms. Cook was necessar-ily negligent at least to some degree and, therefore, that the jury's failure to assign any degree of fault to Ms. Cook is an error that requires a new trial. Because Ms. Cook indicated that the smells were simi-lar to being behind an eighteen-wheeler or a Greyhound bus and because there were no such vehicles around creating these odors, Hyundai asserts that an ordinarily prudent person would have stopped his or her vehicle or would have at least rolled

down the automobile's windows to obtain fresh air.

We disagree with the Hyundai defen-dants' underlying premise that Ms. Cook was negligent. The evidence established that carbon monoxide is an odorless gas. It certainly could have been pouring into Ms. Cook's car through her vents for some period of time before Ms. Cook became aware of the strange odor resulting from the fire in the engine compartment. Ex-pert testimony established that carbon mo-noxide, which ultimately rendered Ms. Cook unconscious, can rise to extremely high levels in an enclosed space such as an automobile within an extremely short peri-od of time. Furthermore, expert testimo-ny established that a person's level of con-sciousness would be declining as his or her carboxyhemoglobin level increased.

Ms. Cook indicated that it was shortly after she began smelling these odors that she was rendered unconscious. As for identifying the odors, Ms. Cook stated that although she smelled different odors, she was "not sure what they were." She thought the odor was coming through the vents, but she did not see any smoke com-ing from the vents or from under the hood of the car. Thus, Ms. Cook "assumed that it was something to do with the road, it being relatively hot and on a paved road."

A jury certainly could have concluded that a person is not negligent for failing to realize when they smell an odor that is similar to being behind an eighteen-wheel-er or a Greyhound bus that carbon monox-ide may be streaming into his or her vehi-cle in quantities so substantial as to create a danger. The time period between Ms.

**20.** *East Tenn., Va. & Ga. R.R. v. Smith*, 77 Tenn. 685, 689 (1882).

**21.** *In re Padgett's Will*, 54 Tenn.App. 1, 9, 387 S.W.2d 355, 359 (1964); *Wilson v. Gadd*, 4 Tenn.App. 582, 584 (1927).

**22.** *Memphis St. Ry. v. Norris*, 108 Tenn. 632, 634, 69 S.W. 325, 326 (1902); *Goodman v. Balthrop Constr. Co.*, 626 S.W.2d 21, 24 (Tenn.Ct.App.1981); *Davis v. Wilson*, 522 S.W.2d 872, 875 (Tenn.Ct.App.1974).

Cook first smelling a strange odor and being rendered unconscious was extremely short. Ms. Cook did not know what was causing the odor and believed that it was attributable to the pavement. This evidence provides material evidence to support the jury's conclusion that Ms. Cook was not negligent for failing to roll down her windows or stop her automobile in response to a strange, unknown odor. Any other conclusion would require a disturbing and highly improper substitution of this court's judgment for that of the jury. We find no error in the jury's allocation of fault.

## VI.

### THE POST-VERDICT DISMISSAL OF MS. COOK'S CLAIM FOR PUNITIVE DAMAGES

Ms. Duran, representing her mother's estate, takes issue with the trial court's decision to grant the Hyundai defendants' Tenn. R. Civ. P. 50.02 motion for a judgment in accordance with their motion for directed verdict. She insists that the record contains evidence that demonstrates clearly and convincingly that the Hyundai defendants acted recklessly by delaying their internal investigation of the causes of the reported engine fires and by delaying the issuance of the recall to address the problems with the Hyundai Excel's reed valve subassembly. We disagree.

### A.

■■ The general principles applicable to orders granting or denying Tenn. R. Civ. P. 50 motions for directed verdict are applicable to motions to direct a verdict on a claim for punitive damages. *See Jarmakowicz v. Suddarth,* No. M1998–00920–COA–R3–CV, 2001 WL 196982, at *12

(Tenn.Ct.App. Feb.28, 2001) (No Tenn. R.App. P. 11 application filed). In reviewing the motion, the trial and appellate courts have the same basic task. They must determine whether the evidence, taken in the light most favorable to the non-moving party,[23] is sufficient as a matter of law to create an issue of fact for the jury to decide. *White v. Vanderbilt Univ.,* 21 S.W.3d 215, 231 (Tenn.Ct.App.1999). A jury issue exists when reasonable persons can draw different conclusions from the evidence or when reasonable doubt exists regarding the conclusions that may be drawn from the evidence. *Burton v. Warren Farmers Coop.,* 129 S.W.3d 513, 521 (Tenn.Ct.App.2002). Because the disposition of a motion for directed verdict involves a question of law,[24] the appellate courts review the trial court's decision de novo, without a presumption of correctness, using the same standards that the trial court used. *Brown v. Crown Equip. Corp.,* 181 S.W.3d at 281; *Gaston v. Tenn. Farmers Mut. Ins. Co.,* 120 S.W.3d 815, 819 (Tenn.2003).

■ To prevail on a claim for punitive damages, the plaintiff must show that the defendant's negligence that proximately caused his or her injury reached a substantially higher level than ordinary negligence. Punitive damages are reserved for only the "most egregious of wrongs." *Cambio Health Solutions, LLC v. Reardon,* 213 S.W.3d 785, 792 (Tenn.2006); *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 901 (Tenn.1992). Thus, the Tennessee Supreme Court has reserved punitive damages for conduct that was so reprehensible that it must be both punished and deterred. *See Culbreath v. First Tenn.*

---

**23.** *Johnson v. Tenn. Farmers Mut. Ins. Co.,* 205 S.W.3d 365, 370 (Tenn.2006); *Hughes v. Lumbermens Mut. Cas. Co.,* 2 S.W.3d at 227.

**24.** *In re Estate of Marks,* 187 S.W.3d 21, 27 (Tenn.Ct.App.2005); *Burton v. Warren Farmers Coop.,* 129 S.W.3d at 520.

*Bank Nat'l Ass'n*, 44 S.W.3d 518, 528–29 (Tenn.2001); *Coffey v. Fayette Tubular Prods.*, 929 S.W.2d 326, 328 (Tenn.1996). In order to be entitled to recover punitive damages, the plaintiff must prove by clear and convincing evidence[25] that the defendant acted either intentionally, fraudulently, maliciously, or recklessly.[26] *Hodges v. S.C. Toof & Co.*, 833 S.W.2d at 901.

■■■ When presented with a motion seeking a directed verdict on a punitive damage claim, a court must determine whether there is sufficient evidence, using the clear and convincing evidence standard,[27] to submit the punitive damage claim to the jury. A submissible punitive damages claim has been made if the evidence and the inferences reasonably drawn from the evidence are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity that the defendant's conduct that caused the plaintiff's injury was intentional, fraud-

ulent, malicious, or reckless. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d at 901.

### B.

■■■ Ms. Cook's claim for punitive damages rests on her assertion that the Hyundai defendants acted recklessly by failing to address the safety concerns with the Hyundai Excel's reed valve subassembly more quickly and by failing to issue recall notices sooner. The requirement of recklessness imposes on Ms. Cook a significantly heavier burden than a simple negligence claim. *See Doe 1 v. Roman Catholic Diocese*, 154 S.W.3d 22, 39 (Tenn.2005). It requires Ms. Cook to prove that the Hyundai defendants were aware of, but consciously disregarded, a risk that was so substantial and unjustifiable that disregarding it constituted a gross deviation from the standard of care that a reasonable person, under all the circumstances, would have adopted. *See Hodges v. S.C.*

**25.** The Tennessee Supreme Court defined "clear and convincing evidence" as "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d at 901 n. 3. While the "clear and convincing evidence" standard does not require as much certainly as the "beyond a reasonable doubt" standard, it is more exacting than the "preponderance of the evidence" standard. Clear and convincing evidence produces in the fact-finder's mind a firm belief or conviction as to the truth of the matter sought to be established. In contrast to the "preponderance of the evidence standard," clear and convincing evidence demonstrates that the truth of the facts asserted is "highly probable," as opposed to "more probable than not." *Teter v. Republic Parking Sys., Inc.*, 181 S.W.3d 330, 341 (Tenn. 2005) (holding that "the clear and convincing evidence standard requires that the truth be highly probable"); *Hibdon v. Grabowski*, 195 S.W.3d 48, 62–63 (Tenn.Ct.App.2005).

**26.** The Tennessee Supreme Court has devised a demanding standard for the types of reprehensible conduct that will trigger a consider-

ation of punitive damages. The court has stated that:

> A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result. . . . A person acts fraudulently when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation. A person acts maliciously when the person is motivated by ill will, hatred, or personal spite. A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances.

*Hodges v. S.C. Toof & Co.*, 833 S.W.2d at 901 (citations omitted).

**27.** *Hughes v. Lumbermens Mut. Cas. Co.*, 2 S.W.3d at 227; *Wasielewski v. K Mart Corp.*, 891 S.W.2d 916, 919 (Tenn.Ct.App.1994).

*Toof & Co.*, 833 S.W.2d at 901. Ms. Cook's burden is made even heavier by the requirement that she prove the Hyundai defendants' recklessness by clear and convincing evidence. *See Hodges v. S.C. Toof & Co.*, 833 S.W.2d at 901.

We have examined the evidence meticulously in a light most favorable to Ms. Cook. The Hyundai defendants sold 837,836 Hyundai Excels during the 1986–1989 model years. In April 1990, they became aware of a possible defect in the reed valve subassembly in these models that appeared to be related to the fact that some of the component parts were not sufficiently corrosion resistant. NHTSA began investigating reports of engine fires in the Hyundai Excels in April 1991. By that time, NHTSA had received forty-four reports of fires in the engine compartment, and Hyundai had received five.

In July 1991, engineers employed by the Hyundai defendants suggested that the corrosion problem with the components in the reed valve subassembly would worsen with the passage of time. Engineers employed by NHTSA reached the same conclusion several months later. In November 1991, NHTSA informed the Hyundai defendants that it had received 261 reports of fires in the engine compartment of the Hyundai Excel and that these reports were occurring with increased frequency. Accordingly, NHTSA advised the Hyundai defendants that it considered these engine fires an "unreasonable safety risk" and requested that the Hyundai defendants initiate a voluntary safety recall of the affected vehicles.

When the Hyundai defendants received NHTSA's letter requesting a voluntary recall, they had received one report of an engine fire in a Hyundai Excel that had caused injury. Nevertheless, the Hyundai defendants agreed to the safety recall within thirty days after receiving NHTSA's letter. They began mailing out 50,000 notices per month in January 1992 and mailed out the notice involving the automobile involved in this case in May 1992. The Hyundai defendants' response to their November 1991 letter apparently satisfied NHTSA because the agency subsequently closed its file on this matter.

In light of all the facts, we have determined that Ms. Cook failed to produce clear and convincing evidence that the Hyundai defendants acted recklessly with regard to the problems associated with the component parts in the reed valve subassembly. No evidence was introduced, either from regulators, representatives of the automobile industry, or consumer safety experts, regarding what an automobile manufacturer's response should be in this or a similar circumstance. What the record does show is that within six months after its employees determined that the corrosion problems would worsen with the passage of time, the Hyundai defendants agreed with NHTSA to issue voluntary recall notices informing the owners of the affected automobiles of the existence of the problem and of their willingness to repair the problem at no cost. Based on this evidence, we have concluded that no reasonable person would find that Ms. Cook established that it was highly probable that the Hyundai defendants were aware of, but consciously disregarded, the potential dangers that could be caused by the corrosion of the component parts in the Hyundai Excel's reed valve subassembly.

## VII.

### THE AWARD OF COMPENSATORY DAMAGES

The Hyundai defendants challenge the $2,000,000 award of compensatory dam-

ages to Ms. Cook on several fronts.[28] They assert (1) that there is no evidence to support a verdict in that amount, (2) that the amount of the verdict is so excessive that it reflects improper conduct by the jury, and (3) that this court, if it declines to grant a new trial, should suggest a remittitur to further reduce the amount of the verdict. We have found no basis to either set aside or reduce the verdict as approved by the trial court.

### A.

The jury returned a verdict awarding Ms. Cook $3,000,000 in compensatory damages. As reflected on its jury verdict form, the jury awarded Ms. Cook $200,000 in economic damages for her past medical expenses. It also awarded Ms. Cook $2,800,000 in non-economic damages. The award for non-economic damages included $500,000 for past pain and suffering, $1,150,000 for future pain and suffering, and $1,150,000 for Ms. Cook's loss of ability to enjoy life.

It was evident to the trial court and the parties that the jury's verdict contained two flaws. First, the jury had awarded Ms. Cook $200,000 for past medical expenses even though she had presented evidence of only $41,456.86 in past medical expenses. Second, the amount of the total compensatory damage award exceeded the amount of Ms. Cook's amended ad damnum clause by $1,000,000.

The trial court's immediate, and perhaps unguarded, reaction to the verdict was that the jury had included punitive damages in

its award of compensatory damages.[29] Ms. Cook's reaction to the verdict was to request the trial court to conform the verdict to her original ad damnum. For their part, the Hyundai defendants argued that the amount of the damage award reflected the jury's bias and passion caused by its consideration of inadmissible evidence. Months later, following the submission and argument of the parties' various post-trial motions, the trial court (1) denied Ms. Cook's after-the-fact request to increase her ad damnum, (2) reduced the verdict to $2,000,000, and (3) approved the verdict as reduced in its role as thirteenth juror.

### B.

The litigants in personal injury cases have a constitutionally protected right to have the disputed factual issues in their case decided by a jury. *See Harbison v. Briggs Bros. Paint Mfg. Co.,* 209 Tenn. 534, 549–50, 354 S.W.2d 464, 471–72 (1962); *Lorentz v. Deardan,* 834 S.W.2d 316, 320 (Tenn.Ct.App.1992). These issues of fact include factual issues with regard to liability[30] and factual issues with regard to the amount of damages.[31] Accordingly, juries bear the primary responsibility for determining liability and awarding damages in personal injury cases. *Transports, Inc. v. Perry,* 220 Tenn. 57, 67, 414 S.W.2d 1, 5 (1967); *Shuey v. Frierson,* 197 Tenn. 235, 241–42, 270 S.W.2d 883, 886 (1954).

When the evidentiary support for a properly approved jury verdict is challenged on appeal, the appellate court's role is limited to determining whether the rec-

---

**28.** No issue is being made regarding the $3,000 award to Ms. Huizar's estate for the value of the automobile.

**29.** Reacting to the jury's verdict, the trial court observed, "I'm convinced the jury considered punitive damages in awarding this amount of damages."

**30.** *Williams v. Brown,* 860 S.W.2d 854, 857 (Tenn.1993); *Smith v. Sloan,* 189 Tenn. 368, 374, 225 S.W.2d 539, 541 (1950).

**31.** *Spence v. Allstate Ins. Co.,* 883 S.W.2d 586, 594 (Tenn.1994); *Beaty v. McGraw,* 15 S.W.3d 819, 829 (Tenn.Ct.App.1998).

ord contains material evidence[32] to support the jury's verdict. Tenn. R.App. P. 13(d); *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn.1994). The reviewing court must, whenever possible, give effect to the jury's verdict. *In re Estate of Marks*, 187 S.W.3d 21, 31 (Tenn. Ct.App.2005). Thus, when the record contains material evidence that supports the verdict, the judgment based on that verdict should not be disturbed on appeal. *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704–05 (Tenn.2000); *Alexander v. Armentrout*, 24 S.W.3d 267, 273 (Tenn.2000).

Tenn. R.App. P. 13(d) does not empower appellate courts to weigh the evidence, to determine the credibility of the witnesses, or to resolve conflicts in the testimony. Rather, appellate courts must construe all the evidence in the strongest light that favors the verdict, assume that all the evidence supporting the verdict is true, and discount the evidence that does not support the verdict. *Whaley v. Perkins*, 197 S.W.3d 665, 671 (Tenn.2006); *Truan v. Smith*, 578 S.W.2d 73, 74 (Tenn.1979); *Willis v. Settle*, 162 S.W.3d 169, 176 (Tenn. Ct.App.2004). The search for material evidence supporting the verdict entails ascertaining whether the record contains any properly admissible evidence relating to the matters at issue that supports the jury's verdict.

## C.

■ We will first consider whether the record contains material evidence to support the judgment for economic damages—the damages for Ms. Cook's past medical expenses. Even though Ms. Cook presented evidence substantiating only $41,456.86 in medical expenses, the jury awarded her $200,000. The record does not contain material evidence to support the jury's $200,000 verdict. It does, however, contain material evidence supporting an award of $41,456.86 for past medical expenses. We find that the trial court took this into account when it remitted the jury's award of $3,000,000 to $2,000,000, and we have concluded that a reduction of the damages for past medical expenses from $200,000 to $41,456.86 is part of the trial court's remittitur.[33]

■ Analyzing the record with regard to the $2,800,000 award for non-economic damages is not so straightforward. Damages for pain and suffering and for the loss of enjoyment of life are not easily quantified and do not lend themselves to easy valuation. *See Pomeroy v. Ill. Cent. R.R. Co.*, No. W2004–01238–COA–R3–CV, 2005 WL 1217590, at * 19 (Tenn.Ct.App. May 19, 2005) (No Tenn. R.App. P. 11 application filed); *see also Giles v. Gen. Elec. Co.*, 245 F.3d 474, 487–88 & n. 24 (5th Cir. 2001). Accordingly, determining the amount of these damages is appropriately

---

**32.** The materiality of evidence does not involve the weight of the evidence. *Kelley v. Johns*, 96 S.W.3d 189, 194 (Tenn.Ct.App. 2002). It involves the relationship between the evidence and the matters at issue in the case. *Knoxville Traction Co. v. Brown*, 115 Tenn. 323, 331, 89 S.W. 319, 321 (1905) (holding that material evidence is evidence material to the question in controversy). One of the seminal treatises on evidence explains that "[m]ateriality concerns the fit between the evidence and the case. It looks to the relation between the propositions that the evidence is offered to prove and the issues in the

case. If the evidence is offered to help prove a proposition that is not a matter in issue, the evidence is immaterial." 1 *McCormick on Evidence* § 185, at 729.

**33.** This court has approved remittiturs that conform a jury's awards for past and future medical expenses to the evidence actually presented. *Hindman v. Doe*, 241 S.W.3d 464, 472 (Tenn.Ct.App.2007); *Palanki ex rel. Palanki v. Vanderbilt Univ.*, 215 S.W.3d at 387–88.

left to the sound discretion of the jury or the judicial finder-of-fact. *Ruiz v. Gonzalez–Carabulo*, 929 F.2d 31, 34 (1st Cir. 1991); *Stafford v. Neurological Med., Inc.*, 811 F.2d 470, 475 (8th Cir.1987); *Huff v. Rodriguez*, 45 A.D.3d 1430, 846 N.Y.S.2d 841, 844–45 (2007); *Pittsburgh Corning Corp. v. Walters*, 1 S.W.3d 759, 780 (Tex. App. 1999); *Farmer v. Knight*, 207 W.Va. 716, 536 S.E.2d 140, 145 (2000).[34]

■ When appellate courts are called upon to review a jury's award of non-economic damages, it is not their prerogative to determine whether the award strikes them as too high or too low. *See e.g., Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir.1989); *Huff v. White Motor Corp.*, 609 F.2d 286, 295–97 (7th Cir.1979); *Rosen v. LTV Recreational Dev., Inc.*, 569 F.2d 1117, 1123 (10th Cir. 1978). Rather, the reviewing court must review the evidence in the record "to determine whether material evidence supports a finding that the jury award is within the range of reasonableness and not excessive." *Dunn v. Davis*, No. W2006–00251–COA–R3–CV, 2007 WL 674652, at *9 (Tenn.Ct.App. Mar.6, 2007) (No Tenn. R.App. P. 11 application filed).

■ The jury's award of $2,800,000 for non-economic damages appears high. However, our task is to review the award of non-economic damages as approved by the trial court. As a result of the trial court's remittitur, Ms. Cook recovered $1,958,543.14 in non-economic damages.[35] We have determined that the record contains material evidence to support this award.

Prior to May 27, 1992, Ms. Cook was healthy and active. She owned her own nursery business and was capable of working hard. As a result of the accident, she suffered painful second and third degree burns that required her to have skin grafts and to wear pressure bandages for more than eighteen months. Most significantly, her inhalation of fumes and smoke have caused her to have COPD. During the thirteen years between the accident and the trial, Ms. Cook endured progressively decreasing lung capacity. She was no longer able to work or to engage in many of her regular daily activities. She could no longer carry a grocery bag by herself; she could no longer stand in the shower; and it became tremendously difficult for her to walk even a few steps. Her interactions with her family became difficult, and her daily life became a constant struggle.

By the time of trial, Ms. Cook was already suffering from severe limitations and faced the grim prospect of living for another estimated twenty-seven years with her condition steadily worsening every day. A once hardy woman had been dramatically physically reduced because her

**34.** "[T]he determination of such nonpecuniary losses as pain and suffering damages involves a subjective element not present in the determination of ordinary facts. The jury trial guarantee requires that the subjective element involved be that of the community and not of judges." Case Comment, *Pennsylvania Supreme Court Reduces Jury Verdict Without Granting Plaintiff Alternative of a New Trial*, 113 U. Pa. L.Rev. 137, 141 (1964); *see also* W. Wendell Hall, *Standards of Review in Texas*, 38 St. Mary's L.J. 47, 215–16 (2006); J. Patrick Elsevier, Note, *Out-of-Line: Federal Courts Using Comparability to Review Damage Awards*, 33 Ga. L.Rev. 243, 245–46 (1998);

Diana Garcia, Comment, *Remittitur in Environmental Cases: Developing a Standard of Review for Federal Courts*, 16 B.C. Envtl. Aff. L.Rev. 119, 134–35 (1988).

**35.** Included in the $2,000,000 award of compensatory damages to Ms. Cook was $41,456.86 for her past medical expenses. Accordingly, subtracting these damages from the total damage award provides the amount of non-economic damages awarded to Ms. Cook. [$2,000,000 − $41,456.86 = $1,958,-543.14].

lungs were simply unable to supply enough oxygen to her body. Whether we would have awarded Ms. Cook $1,958,543.14 in non-economic damages is not the point. The assessment of these subjective damages was for the jury to decide in the first instance and then for the trial judge. We have determined that the record contains material evidence to support the judgment, as approved by the trial court, for $2,000,000 in compensatory damages.

**D.**

The Hyundai defendants also insist that the amount of the judgment reflects improper conduct by the jury. They insist that the jury must have included punitive damages in its calculation of compensatory damages.[36] The record provides no basis for concluding that the jury's award of compensatory damages included punitive damages.

The amount of a verdict alone can be so large that it reflects passion, prejudice, or caprice. *Am. Lead Pencil Co. v. Davis*, 108 Tenn. 251, 258, 66 S.W. 1129, 1130 (1901). However, the appellate courts may step in and invalidate a judgment based on a jury's verdict only when there is no material evidence to support the verdict, *McCullough v. Johnson Freight Lines, Inc.*, 202 Tenn. 596, 604, 308 S.W.2d 387, 391 (1957), or when the amount of the verdict is so excessive or unconscionable that it shocks the judicial conscience and amounts to a palpable injustice, *Johnson v. Woman's Hosp.*, 527 S.W.2d 133, 142–43 (Tenn.Ct.App.1975); *Harrison v. Wilkerson*, 56 Tenn.App. 188, 196, 405 S.W.2d 649, 652–53 (1966).[37]

When asked to determine whether a verdict should be set aside based on the amount of the damage award alone, the courts must consider the nature and extent of the plaintiff's injuries, the pain and suffering the plaintiff experienced, the expenses the plaintiff incurred as a result of the injuries, the plaintiff's loss of earning capacity as a result of the injuries, the impact the injuries have had on the plaintiff's enjoyment of life, and the plaintiff's age and life expectancy. *Holt v. McCann*, 58 Tenn.App. 248, 256, 429 S.W.2d 441, 445 (1968); *Nash–Wilson Funeral Home, Inc. v. Greer*, 57 Tenn.App. 191, 203, 417 S.W.2d 562, 567 (1966).

When the conduct of a jury is challenged, the appellate courts begin with a presumption that juries are honest and conscientious and they have followed the instructions given to them. *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn.2004); *State v. Williams*, 977 S.W.2d 101, 106 (Tenn.1998). This record contains no objective basis for concluding that the jury did not follow the trial court's instructions. We have already determined that the record contains material evidence to support the judgment awarding Ms. Cook $2,000,000 in compensatory damages. Any concern about the amount of the original verdict was cured when the trial court suggested a remittitur reducing the verdict to $2,000,000. Accordingly, we cannot say that the amount of the award for compensatory damages in the judgment is excessive or unconscionable.

**E.**

Finally, the Hyundai defendants assert that this court should exercise our prerog-

---

**36.** The trial court opened the door for this argument by commenting immediately after the jury reported its verdict that, "I'm convinced the jury considered punitive damages in awarding this amount of damages."

**37.** *See also, e.g., Manus v. Am. Airlines, Inc.*, 314 F.3d 968, 973 (8th Cir.2003); *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 15 P.3d 338, 351 (2000); *John Crane, Inc. v. Jones*, 650 S.E.2d 851, 858 (Va.2007).

ative to suggest a remittitur to further reduce the amount of non-economic damages awarded to Ms. Cook. This court has the authority under Tenn.Code Ann. § 20–10–103(a) (1994) to suggest a further remittitur. *See Dunn v. Davis,* 2007 WL 674652, at * 12–13; *Long v. Mattingly,* 797 S.W.2d 889, 896 (Tenn.Ct.App.1990). However, we have already determined that the trial court suggested remittitur was proper and that the record contains material evidence to support the amount of the non-economic damages awarded in the judgment. Accordingly, we find no basis to suggest a further remittitur of economic damages in this case.

## VIII.

### THE EFFECT OF MS. COOK'S DEATH ON THE JUDGMENT

The Hyundai defendants also request this court to take judicial notice of the fact that Ms. Cook died on October 19, 2005, approximately four months after the trial. Without citation to authority, they assert that since a portion of the damages were predicated on Ms. Cook's 23.69–year life expectancy, the fact of Ms. Cook's death provides this court with an appropriate reason to suggest a further remittitur in the amount of compensatory damages. Case law and policy stand firmly in opposition to adopting the Hyundai defendants' argument.

The argument of the Hyundai defendants does not fit within the proper purpose and scope of Tenn. R.App. P. 14 which permits the consideration of post-judgment facts in certain limited circumstances. The Advisory Commission Comment explains:

> Although the appellate court should generally consider only those facts established at trial, it occasionally is necessary for the appellate court to be advised of matters arising after judgment.

These facts, unrelated to the merits and not genuinely disputed, are necessary to keep the record up to date. This rule gives the appellate court discretion to consider such facts. This rule is not intended to permit a retrial in the appellate court.

Tenn. R.App. P. 14, Advisory Commission cmnt.

While Ms. Cook's death is undisputed, the Hyundai defendants' purpose in presenting this fact for consideration is not "unrelated to the merits." To the contrary, they are essentially asking this court for a retrial on damages based on the fact, only known post-judgment, that Ms. Cook did not reach her estimated life-expectancy. This is simply not the intended purpose of Tenn. R.App. P. 14. *Duncan v. Duncan,* 672 S.W.2d 765, 767–68 (Tenn. 1984) (holding that Tenn. R.App. P. 14 cannot be used to relitigate an issue at the appellate level based on facts occurring after the entry of the judgment).

Over one hundred years ago, the Tennessee Supreme Court held that a tort claim was converted into a debt as the result of a judgment and that this debt was simply suspended, not vacated, when the judgment is appealed. *Heald v. Wallace,* 109 Tenn. 346, 351, 71 S.W. 80, 81 (1902). The death of the judgment creditor does not extinguish the debt. Accordingly, courts in other jurisdictions that have confronted this issue have held that the plaintiff's death after the entry of the judgment should have no effect on the judgment on appeal. The United States Court of Appeals for the Sixth Circuit has explained:

> To hold that a plaintiff's death following a jury verdict is the sort of "substantial injustice" requiring the reopening of cases or award of new trials ... would be to invite a morass of appeals from

defendants in cases where the plaintiffs did not survive an "acceptable" amount of time following the entry of final judgment. Conversely, such a rule would require reopening cases where a plaintiff's life span exceeded the expectation presented to the jury. . . .

Moreover, we wonder what standard the defendants would have us create. Is a year too short or too long a time to require a plaintiff's post-judgment survival? Six months? Three months? Would verdicts in exposure cases be reopened because of newly-developed cures for asbestosis or DES-related maladies? Any judicial rule establishing contingencies on the enjoyment of damage awards would necessarily be arbitrary.

*Davis v. Jellico Cmty. Hosp., Inc.,* 912 F.2d 129, 135 (6th Cir.1990). The court also noted that "[t]he fact that a plaintiff dies even a second after judgment is entered does not render evidence regarding an *expected* life span 'false' nor the judgment invalid. The testimony regards an expectancy, not a certainty." *Davis v. Jellico Cmty. Hosp., Inc.,* 912 F.2d at 136.

Similarly, the Louisiana Court of Appeals has explained that "[t]he trial court's award of damages for personal injuries is based upon the evidence before it, including the life expectancy of the injured person; in making such award, the trier of fact necessarily takes into consideration that the injured person, despite the general life expectancy of persons of his group, may himself live far shorter than such general life expectancy." *LeBlanc v. Metal Locking of La., Inc.,* 258 So.2d 683, 686 (La.Ct.App.1972). Accordingly, we decline to accept the Hyundai defendants' invitation to adopt a rule that allows a plaintiff's

living a period shorter than or longer than an anticipated life expectancy to provide a basis for re-visiting an otherwise valid award for compensatory damages.

## IX.

### THE AWARD FOR DISCRETIONARY COSTS

As a final matter, the Hyundai defendants insist that the trial court erred with regard to its award for discretionary costs under Tenn. R. Civ. P. 54.04(2). Specifically, they argue that the trial court erred with regard to certain court reporter expenses and for the time Ms. Cook's expert witnesses spent preparing for trial. We have determined that the trial court erred with regard to several items of the discretionary costs.

### A.

At the conclusion of the trial, Ms. Cook requested the trial court to award her $178,727.52 in discretionary costs under Tenn. R. Civ. P. 54.04(2).[38] Following a hearing, the trial court entered an order on December 20, 2005 awarding Ms. Cook $70,584.29 in discretionary costs. The Hyundai defendants now take issue with a portion of the court reporter's per diem charges for the trial, for the court reporter's fees for attending hearings, and for the court reporter's charges for transcripts. They also take issue with the costs associated with the preparation time of Ms. Cook's witnesses and with the calculation of the fees charged by two witnesses for attendance at trial.

### B.

▆▆▆▆ Tenn. R. Civ. P. 54.04(2) permits prevailing parties in civil actions to recover "discretionary costs." The pur-

---

**38.** Ms. Cook initially requested $181,237.77 in discretionary costs but reduced this request three months later to $178,727.52.

pose of this provision is not to punish the losing party but rather to help make the prevailing party whole. *Owens v. Owens,* 241 S.W.3d 478, 496–97 (Tenn.Ct.App. 2007); *Scholz v. S.B. Int'l, Inc.,* 40 S.W.3d 78, 85 (Tenn.Ct.App.2000). The particular equities of the case may influence a trial court's decision to award discretionary costs, *Perdue v. Green Branch Mining Co.,* 837 S.W.2d 56, 60 (Tenn.1992), and, therefore, parties are not entitled to discretionary costs simply because they prevail. *Scholz v. S.B. Int'l, Inc.,* 40 S.W.3d at 85; *Sanders v. Gray,* 989 S.W.2d 343, 345 (Tenn.Ct.App.1998).

 The party seeking discretionary costs has the burden of convincing the trial court that it is entitled to these costs. *Carpenter v. Klepper,* 205 S.W.3d 474, 490 (Tenn.Ct.App.2006); *Stalsworth v. Grummons,* 36 S.W.3d 832, 835 (Tenn.Ct.App. 2000). As a general matter, a party seeking discretionary costs can carry its burden by filing a timely and properly supported motion demonstrating (1) that it is the prevailing party, (2) that the costs being sought are included in Tenn. R. Civ. P. 54.04(2), (3) that the costs are necessary and reasonable, and (4) that it has not engaged in conduct during the litigation that would justify depriving it of the costs it is requesting. *Trundle v. Park,* 210 S.W.3d 575, 582 (Tenn.Ct.App.2006); *Waggoner Motors, Inc. v. Waverly Church of Christ,* 159 S.W.3d 42, 65–66 (Tenn.Ct.App. 2004); *Mass. Mut. Life Ins. Co. v. Jefferson,* 104 S.W.3d 13, 35–36 (Tenn.Ct.App. 2002).

 Awards of discretionary costs are, naturally, decisions that address themselves to the trial court's sound discretion. *Owens v. Owens,* 241 S.W.3d at 497; *Stalsworth v. Grummons,* 36 S.W.3d at 835–36. Accordingly, we employ a deferential stand when reviewing a trial court's decision either to grant or to deny

motions to assess these costs. Because these decisions are discretionary, we are generally disinclined to second-guess the trial court's decision unless the trial court has "abused" its discretion. The party who takes issue on appeal with a trial court's decision regarding discretionary costs has the burden of demonstrating that the trial court abused its discretion. *JPMorgan Chase Bank v. Franklin Nat'l Bank,* No. M2005–02088–COA–R3–CV, 2007 WL 2316450, at 3 (Tenn.Ct.App. Aug.13, 2007) (No Tenn. R.App. P. 11 application filed).

### C.

 The Hyundai defendants raise three issues regarding court reporting expenses incurred by Ms. Cook. First, they assert that the $2,974 award for the court reporter's per diem during the trial was miscalculated. Second, they assert that this award included costs associated with the preparation of the transcript which are covered by Tenn. R.App. P. 24(b). Third, they insist that the trial court erred by awarding Ms. Cook $1,744.75 for the court reporter's per diem at hearings other than the trial.

The court reporter's June 16, 2005 bill seeking payment of $5,419 was essentially unitemized. The trial court approved $2,974 representing the fees and miscellaneous expenses for attending the six-day trial. However, the court's calculations are mistaken. The court reporter charged $250 per day to attend the trial, and accordingly the fees for a six-day trial should have been $1,500. When added to the $474 in miscellaneous fees, the total fees for the six-day trial were $1,974. Accordingly, the trial court's award of $2,974 must be reduced by $1,000. This calculation does not include any of the fees or costs associated with preparing the transcript.

The trial court also approved $1,744.75 in fees charged by court reporters to attend pretrial hearings. These costs are not allowable for two reasons. First, court reporter fees for attending pretrial hearings are not permitted by Tenn. R. Civ. P. 54.04(2). Second, $1,617.25 of the fees relate to the preparation of transcripts of these pre-trial hearings which are likewise not permitted by Tenn. R. Civ. P. 54.04(2). Accordingly, the $1,744.75 award for court reporter fees associated with the pretrial hearings must be reversed.

The trial court approved $25,700 in fees charged by Ms. Cook's witnesses to prepare for trial. Tenn. R. Civ. P. 54.04(2) does not permit the recovery of these fees. *Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d at 66. Accordingly, the award of discretionary costs must be reduced by an additional $25,700.

The Hyundai defendants take issue with the trial court's approval of the $3,700 fee charged by Gary Young. According to Mr. Young's bill, this fee included not just his in-court testimony but the entire thirty-seven hours he was on-call during the week of May 24, 2005. The Hyundai defendants argue that Mr. Young's fee should have been limited to the single day that he was present in court. This court has already declined to adopt a bright-line rule like the one advanced by the Hyundai defendants. *Stalsworth v. Grummons*, 36 S.W.3d at 835. The Hyundai defendants have failed to demonstrate that the trial court abused its discretion by permitting Mr. Young's reserving of this amount of time in his schedule to testify at trial to qualify as a reasonable and necessary expense. Accordingly, the trial court did not err in approving Mr. Young's $3,700 fee.

Dr. Kimball I. Maull testified twice during the trial. He first testified on May 26, 2005 during Ms. Cook's case-in-chief, and then he testified a second time in rebuttal on May 31, 2005. Dr. Maull's bills for these two days were $7,528.14. His itemized bills reflect that on each day, he charged Ms. Cook for eight hours of time. Thus, based on his fee of $350 per hour, Dr. Maull charged Ms. Cook $5,600 for the time spent on the two the days he testified. The Hyundai defendants argue that the trial court erred by approving the entire $7,528.14. We agree. Based on Dr. Maull's itemized bills, Ms. Cook was entitled to recover only $5,600. Accordingly, the award of discretionary costs related to Dr. Maull's services must be reduced by $1,928.14.

The trial court awarded Ms. Cook $70,584.29 in discretionary fees in accordance with Tenn. R. Civ. P. 54.04(2). We have determined that $30,372.89 of these fees and expenses do not qualify as discretionary costs. Accordingly, on remand, the trial court is directed to enter an order reducing its award of discretionary costs from $70,584.29 to $40,211.40.

## X.

We affirm the judgment as modified herein and remand the case to the trial court for further proceedings consistent with this opinion. We tax the costs of this appeal in equal proportions to Hyundai Motor America, Inc. and Hyundai Motor Company and their surety, and to Nickie Duran in her capacity as the administrator of the estate of Norma Faye Cook for which execution, if necessary, may issue.

WILLIAM B. CAIN, J., not participating.

### ORDER DENYING THE PETITION FOR REHEARING

Hyundai Motor America, Inc. and Hyundai Motor Company ("Hyundai Defen-

dants") have filed a timely petition for rehearing in accordance with Tenn. R. App. P. 39 requesting this court to reconsider portions of our February 13, 2008 opinion relating to the cross-examination of Dr. Thomas Bennett and to the introduction during Ms. Cook's case-in-chief of evidence regarding her claim for punitive damages. The petition raises no new matter that was not considered and addressed in our original opinion. Accordingly, the petition is respectfully denied with all associated costs taxed to the Hyundai Defendants.