# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
August 6, 2013 Session

## JAMES M. BOWLEY, ET AL. v. RICHARD LANE, ET AL.

**Appeal from the Circuit Court for Monroe County**
**No. V06-279H     Lawrence H. Puckett, Judge**

_____

**No. E2012-00134-COA-R3-CV - Filed August 29, 2013**

_____

James M. Bowley and Barbara A. Bowley ("Plaintiffs") sued Richard Lane, Alvin Butler, and Danny Nicholson ("Defendants")[1] alleging defective construction of a log home built by Defendants for Plaintiffs. After trial, the Trial Court entered judgment upon the jury's verdict finding and holding, *inter alia*, that Defendants had breached the implied warranty of habitability, and that Plaintiffs had sustained $50,000 in damages as a result of this breach. Defendants appeal to this Court raising an issue regarding whether the Trial Court erred in approving the verdict and denying their motion for new trial or for remittitur. Plaintiffs also raise an issue alleging that the evidence does not support the verdict. We find and hold that material evidence supports the jury's verdict, and further find no error in the Trial Court's denial of Defendants' motion for new trial or for remittitur, and the Trial Court's denial of Plaintiffs' motion for new trial or for additur. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and THOMAS R. FRIERSON, II, J., joined.

John W. Cleveland, Sr., Sweetwater, Tennessee, for the appellants, Richard Lane, Alvin Butler, and Danny Nicholson.

_____

[1]Plaintiffs also sued William Howe d/b/a Century 21 Howe Realty & Auction and Kay Nicholson. Plaintiffs' claims against William Howe d/b/a Century 21 Howe Realty & Auction were voluntarily dismissed prior to trial. Plaintiffs' claims against Kay Nicholson were tried and the jury returned a verdict finding that Kay Nicholson was not a partner of Danny Nicholson and that neither Kay Nicholson nor Danny Nicholson breached the contract with Richard Lane and Alvin Butler. Kay Nicholson is not involved in this appeal.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the appellees, James M. Bowley and Barbara A. Bowley.

## OPINION

### Background

Plaintiffs moved from Indiana to Tennessee to retire. Prior to moving to Tennessee, Plaintiffs contacted a realtor and viewed several houses including at least one log house. Plaintiffs decided that they wanted to purchase a log house. Plaintiffs contracted with Richard Lane and Alvin Butler to purchase real property located in Vonore, Tennessee and to have a log house ("the House") constructed upon this property. The closing on the House was in 2004. Initially, Plaintiffs used the House on a part-time basis while still living part-time in Indiana. Plaintiffs filed this lawsuit in July of 2006. In 2008, Plaintiffs began living in the House full-time. The case proceeded to trial before a jury in September of 2010.

Ms. Bowley testified at trial that she and her husband paid $165,000 for the House and the land upon which the House sits. They also purchased an adjoining lot for $20,000. Ms. Bowley testified that she and her husband gave their realtor the authority to do the final walk-through prior to the closing in early 2004 as Plaintiffs were unable to travel from Indiana to Tennessee due to snow and personal commitments. Plaintiffs released the final payment upon their realtor's word even though the House was not completed at that time.

Ms. Bowley explained that she and her husband made short trips to the House after closing and then moved into the House full-time in 2008. During their trips to the House, Plaintiffs noticed things that had not been done. They contacted Defendants and began to leave punch lists for the builders of things to be fixed. Ms. Bowley testified that although Defendants told her that the problems would be fixed, many of the items on the punch lists never were completed.

Ms. Bowley testified that during construction of the House she and her husband traded having hand-hewn logs and chinking in order to obtain a full bath in the basement. She further stated that the House was supposed to have a cedar wall in the second level bathroom and a bisque-colored toilet, sink, and bathtub, and that all the closets in the House were to have been cedar. Ms. Bowley testified that none of these things were done. Ms. Bowley testified that the back wall of the basement bathroom is exposed brick and there is no floor other than the basement floor. Ms. Bowley admitted that the chinking they gave up would have been between the logs.

Ms. Bowley testified that water comes into the House on two sides. She stated that the water "comes from the top part of the house, the top part of the logs, and it runs back through the light switches. It comes down and then it goes to the plug outlets and comes down, and there's a stained log with downward - - it comes down through the logs." Ms. Bowley also testified that wasps come "through the cracks in the walls" of the House. Ms. Bowley testified that scorpions, geckos, bees, spiders, and fire ants have also come into the House.

Ms. Bowley testified that a portion of the roof blew off the House in the fall of 2009. As a result, a portion of the roof had to be removed and repaired. Ms. Bowley testified that squirrels and birds lived in the roof. She further stated that the floors in the House are separating and buckling. Ms. Bowley testified that they have had problems with doors and windows that are difficult or impossible to open or shut.

Mr. Bowley also testified at trial. He stated that he and his wife hired someone to fix the roof after wind blew up a portion of the roof in the fall of 2009. He also acknowledged that other than using water sealant on the outside deck, trying to screw back in siding above the garage door, and putting some polyurethane on the floors, they have done no maintenance on the House. Mr. Bowley testified that if the House had been constructed properly he thought it would be worth around $350,000. When asked how much he thought he could sell it for in its present condition, Mr. Bowley stated: "Maybe seventy-five thousand, with the land."

Architect Damon Falconnier testified as an expert witness for Plaintiffs. Mr. Falconnier first visited the House in August of 2007, and testified that he had been back to the House several additional times prior to trial. Mr. Falconnier testified that during his first visit:

> I informed the owner that I - - I said, you know, this is your house but if I were you I would put a couple of jack posts in, because I saw a tremendous amount of swagging in the six-by-twelve that spans eighteen foot, seven and a half that's above the garage door, and the garage door beam was swagging considerably when I was there, and so at my instruction he did put in two jacks there, and they have a significant amount of weight on them at this time, even to the point of maybe a potential failure on those jacks. Those are generally designed for, I believe, ten thousand pounds per square, per jack, and we may be exceeding that at this time.

Putting in the jacks removed the ability to use one garage of the two-car garage.

Mr. Falconnier was asked what was wrong structurally with the House. He testified that there is swag in the deck and the railing is unable to support a normal industry standard of two hundred and fifty pounds of pressure. He also stated that there was a sag over the garage door and that he observed ganged, or nailed together, two-by-eights that were "not a structural condition to span sixteen feet …." When asked what was causing the sag, Mr. Falconnier testified that there are thousands of pounds of pressure from the upper floors of the House pushing down on a four-by-twelve ridge beam that "doesn't carry a structure." He explained that the ridge beam is actually, because of its size, a ridge board and stated: "It should be stronger.… [I]t's transmitting the forces into the columns that they were not designed for." Mr. Falconnier explained that the decision to use the ridge board has effected other things. He stated: "what we don't have here is this ridge beam is not doing its job up here and so it is transmitting forces - - … to where these walls are actually going out. There are no collar ties here to tie this wall to the structural system, so this wall is sliding out." Mr. Falconnier further stated: "So, as this is sagging, it leaves a place for this to sag, which leaves a place for this to sag. So it's all a compounding effect. There's not one beam to fix, there's lots of things to fix."

Mr. Falconnier also testified about other problems with the House stating that "we would always want a log to go completely through the house, at least one log, to actually have it to go from one end to the other so that we can tie the house together," but the log at the top of the door which should do this is spliced. The door could be opened when Mr. Falconnier visited the House in 2007. He testified that the door could not be opened by the time of trial and stated: "If you got it open the glass would probably shatter, because there is so much weight on this door, because of what's happening above, how the house is spreading." Mr. Falconnier testified that joist hangers, which are "a structural member that carries the load from the floor to the beam," should be fully nailed per the manufacturer's instructions but have only two nails in each side. Mr. Falconnier stated that, in short, the House is "sagging without maximum loading, you know. It's sagging without hundreds of people, you know, in the house, without two cars sitting on top of it. I would hate to see what happened if we actually had maximum loading, if we had a, you know, a - - forty people over for a party one day. I mean, we would have, we would have a problem." He also stated that the dormer is not properly supported and "will eventually sag more …."

Mr. Falconnier also testified that electrical boxes should have been covered but were not. He noted a pipe to a sink was going in the wrong direction trapping water, and he stated that the basement stairs are "not compliant in any way with anything." The treads are at differing heights and the stairs lack "compliant hand rails" and "compliant head space."

Mr. Falconnier testified that the House was not properly caulked. He found "that we actually don't have the corners [of the House] actually bolted together." He also stated that he was able to slide a piece of cardboard completely into the dovetail joint proving "that there was no caulk and there was no attachment between those logs." Mr. Falconnier testified that there is no sealant. He explained: "This particular log system is what we call log on log, it's called a rectangular log, log on log, and it is not required to be chinked. You can buy it unchinked and there's not a problem, this house does not have any chinking, but what it needed was another feature that it didn't have [sealant]." Sealant is used on a log house because it is designed to be expandable as the wood expands and contracts. With regard to chinking, Mr. Falconnier explained: "This is a preference of the homeowners. In that case it's decorative." Mr. Falconnier stated that "a log home settles three inches in eight feet. That's a huge amount of settling."

Mr. Falconnier also testified that "the quality of this metal roofing is very poor …," and that he observed "large amounts of silicone caulk that's been gobbed in areas" on the roof. Mr. Falconnier testified that there is "no flashing in place under any windows … So we've got water going behind the trim, we're getting around the doors and windows." Water has gotten in the door causing the floor to cup and change shape due to moisture content.

Mr. Falconnier also testified that the House is moving away from the fireplace. He stated "the chimney's staying where it is and that wall is moving …." He also noted that there are three or four cracks in the front wall of the House. Mr. Falconnier opined that the House is not structurally sound.

David Carter of Appalachian Log Homes and Dave Carter Construction also testified for Plaintiffs. When asked about his business, Mr. Carter testified that: "Appalachian Log Homes buys log home kits and the labor services to raise those kits on prepared foundation. Dave Carter Construction takes on remodeling, additions and new construction of conventional homes as well as log timber homes." Mr. Carter reviewed Mr. Falconnier's report on the House and determined what it would take to repair the House. He stated:

> I have not come up with a price on what it would take to repair the house because I didn't feel comfortable on just fixing the obvious, because once you start repairing and fixing the obvious, more times than not you expose other things that need to be fixed, and you don't know that until you get into it. The only thing that I've done is given a price to basically take down the house and build it back in a methodical way, and then another price to just demolish existing house and build it back new.

Mr. Carter opined that the least expensive way to fix the problems would be to tear down or demolish the House and build it back new. He stated that the cost to do this would be $369,777.

After he calculated the price of $369,777, Mr. Carter went back and removed some of the top dollar items from his estimate to reflect what was in the House as it exists. Taking this information into account Mr. Carter calculated that the new price to repair the House would be $335,643. When asked Mr. Carter admitted that the type of log he would use in the rebuild is five percent more expensive than the ones in the House. He also admitted that the roof system he suggested is more expensive than the one on the House, and the flooring he suggested is ten to fifteen percent more expensive. Mr. Carter's estimate suggested granite countertops. At the time of trial the House did not have granite countertops.

Mr. Carter was asked in detail about the structural issues he noted in his report. Mr. Carter was asked how much it would cost to add additional columns to correct the main girder beam, which spans too far, and he estimated that it would cost approximately $600 if there were footers. To correct the floor joist hangers would cost approximately $100. Mr. Carter calculated that to replace the improper two-by-eight header system in the garage door opening by building a concrete block or column would cost approximately $400 to $600. Mr. Carter stated that to affix steel plates to the collar ties in the main roof system would cost approximately $2,000 to $3,000. Mr. Carter admitted that he walked in the loft of the House, and stated that when walking "you're not bouncing around." He also admitted that if there were fiber in the concrete it would not need to be taken out and replaced. Mr. Carter was aware that the roof has been replaced. He stated that to replace the header logs over the side and back door would cost approximately $1,500, and to cap all of the electrical junction boxes would cost approximately $20 or $30. Mr. Carter calculated that to affix the handrails to the deck would cost approximately $300 and to fix the interior handrails would cost approximately $600 to $1,000 depending upon the decorative style chosen.

Mr. Carter also was asked about the non-structural issues he noted in his report. He stated that to seal visible gaps in the logs would cost approximately $2,000 to $3,000. Cracks in the logs are also known as checks. Mr. Carter admitted that logs often check as they weather. He stated "It's just a natural process as the wood dries out." Mr. Carter testified that if a check is an upward facing check where you could stick a credit card it could catch water and should be sealed. He stated that one would usually leave a downward facing check alone. Mr. Carter testified that the upward facing checks would be fixed in the same manner as gaps between the logs would be fixed. He testified that to replace the unfinished stairs from the basement to the upper floor with similar stairs would cost approximately $1,600 to $2,000. To fix the three doors by taking off the trim, lifting out

the door and window, putting in slotted jams, and putting the window back in would cost approximately $500 per door. Mr. Carter testified that to add exhaust vents in the bathrooms would cost approximately $300 each, and to fix the lap siding that is cupping would cost approximately $600 to $700.

Mr. Carter agreed that for all of the repairs about which he testified, if the math is correct, the total would be approximately $16,330. He, however, testified that this would not correct all of the problems as stated in Mr. Falconnier's report. He stated: "I believe there are some plumbing issues in there that need to be addressed as well as some others, but it's only a patch and a fix." Mr. Carter admitted that he saw the House only one time in January of 2010, approximately eight months prior to trial.

John Edward Rucker is the concrete finisher who finished the concrete in the basement of the House. Mr. Rucker testified that when he first got to the House there was a concrete block foundation and the area where the concrete was to be poured had been prepped with gravel and plastic. He was asked if there were footers, and he testified: "I'm wanting to say there was five pier footers in it, and I do know there was one because one of the workers that worked for me wrecked the wheelbarrow in it. When he was pushing it off it turned over." Mr. Rucker testified: "The concrete was four across and four inches thick, except where the piers was at, and then it was approximately six to eight inches deep over the piers." He also stated: "We ordered four thousand psi concrete with (inaudible), because of the weather being cool and it being in the basement, but the four thousand with fiber is generally what anyone has put in a home." Mr. Rucker explained that fiber is an additive to keep concrete from pulling apart when it cracks "[b]ecause concrete is going to crack." Mr. Rucker was asked if the concrete he poured was suitable to park cars on, and he stated that they slick finished it to be "used for livable," but that it was "suitable for a truck garage."

Defendant Richard Lane testified that the House and lot together were sold for $165,000. He was asked what the fair market value of the lot alone would have been in September of 2003, and he stated: "Well, with improvements to it, with like a driveway and the public water and any grade work that had been done to it with the improvements that lot would have probably been worth anywhere from twenty-five to thirty-five, forty-thousand dollars." Mr. Lane agreed that if the lot were worth twenty-five thousand, the House would have been worth $140,000.

Mr. Lane testified that the House originally was supposed to have two nine-foot garage doors with a partition in the middle, but Ms. Bowley did not want two doors. Ms. Bowley also requested that a partition wall, which was to be behind the steps in the basement, be eliminated. Mr. Lane testified that Ms. Bowley requested the kitchen window

be taken out and a larger one be put in, and that she also requested a door be put in on the side of the House to the deck.

Mr. Lane testified that they were unable to obtain cedar because the sawmills did not have any, and that their supplier was unable to supply bisque bathroom fixtures. Mr. Lane testified that these difficulties were explained to Ms. Bowley and "she agreed for us to go ahead, then, and put in the regular siding that's in the house," and "agreed to go ahead and have the white [bathroom fixtures] put in."

Mr. Lane testified that the contract between Plaintiffs and Defendants provided for a stud wall with posts for support in the basement. Ms. Bowley asked to have the wall in the basement taken out. Mr. Lane testified that the stud wall that was taken out would have been underneath, and providing support for, the long beam that the architect testified had insufficient support. Mr. Lane agreed that if any of the changes Ms. Bowley wanted would not have been safe to make she would have been informed, but when asked if they would have made the changes anyway, he stated: "If she demanded it done." Mr. Lane testified that the contract called for lower bath walls to be pine if possible. He admitted that the lower bath has one block wall.

Mr. Lane testified:

After we met with Mr. Bowley and he showed us through the house, and the things that, most of the things that he was showing us was regular maintenance to be done on the house that he had not performed. And we agreed and talked, Mr. Butler and Danny and myself, that if - - and we approached Mr. Bowley with if he would buy the material that we would furnish the labor to do it and he would not agree to do it.

* * *

I can testify to the fact that Danny and Kay Nicholson met with Ms. Bowley, and I was with them at the time, and they instructed her on how to maintain a log house. And I remember one of the examples that they gave to her, was if you take a brick, a piece of vinyl and a piece of wood and you set them out in the open for one year, and when you came back the brick would pretty much be the same, the piece of vinyl would pretty much be the same, but the piece of wood would have weathered or warped due to whatever conditions the weather was, that it must have regular maintenance.

Mr. Lane disagreed with the statement that if a log house is built properly that no maintenance is necessary for two or three years.

Defendant Alvin Butler testified that the structural defects Plaintiffs claim in this suit never were mentioned on the Plaintiffs' punch lists. Mr. Butler testified that after Plaintiffs purchased the House, but before they moved in full-time, he drove by the House and observed that a door "stayed open about, I'd say probably two to three weeks." The door is the same one that Plaintiffs claim now has floor cupping. Mr. Butler testified that he thought that Plaintiffs were living in the House by that time, but that eventually he investigated. He stated he "called [Ms. Bowley] and told her the door had been open for two or three weeks, and on the counter there was rotten bananas, grapes." Mr. Butler also stated that there was water in the House. Ms. Bowley testified that one would not be able to see the House from the highway without coming up the driveway "because there's a steep hill, and … [w]hen you start going up, that's when you can see [the House]."

Mr. Butler testified that the wall Ms. Bowley did not want in the garage was to have been a block wall or "a little container wall, between the garage door." With regard to the log across the top of the garage door, Mr. Butler testified: "We would have probably changed that if we have [sic] known that she wanted one garage door down there at the time, but once you set the logs it's hard to change it, you know what I'm saying." He admitted that this could possibly have been jacked up.

James Edward Cucciarre, owner of Jim Bob Contracting, Inc., testified for Defendants. Mr. Cucciarre has held a contractor's license for approximately fifteen years. He also holds an electrical license, a plumbing license, and a HVAC license. Mr. Cucciarre does not build houses, but he does repairs, remodeling, and additions. He testified that he has repaired log houses.

Mr. Cucciarre inspected the House and prepared an estimate of approximately $16,091 to repair the House. During his inspection Mr. Cucciarre was at the House for a little over an hour. His report includes some structural items such as removing and replacing a metal beam for support.

Mr. Cucciarre reviewed Mr. Falconnier's report and stated: "His report is good. My experience with architects is they usually go overboard a little bit but, yeah, he addressed the issues." Mr. Cucciarre was asked about Mr. Falconnier's statement that the walls of the House are being pushed out because the collar ties are up too high near the roof, and he stated:

I didn't actually see the walls themselves pushing out. Usually, like on the collar ties, the way they build them, the support is holding it up, and they have supports through there. So, I mean, it's actually holding it up. And, in order for it to go out, the center supports have to go down.… There was support, sir. … In the balcony area, and then down through the kitchen.

Mr. Cucciarre admitted that he did not do a full inspection, but looked only at what he was asked to look at. Mr. Cucciarre was asked about any problems he did not see or consider, and he admitted "If it's not on the architect's paperwork or what I was shown, it's not in there." Mr. Cucciarre was asked if he saw any evidence that the House was not structurally sound, and he answered "No, sir."

After trial, the jury returned its verdict finding in favor of the Defendants on all claims except Plaintiffs' claim that the House was not "constructed so as to comply with the implied warranty of habitability …." The jury found Plaintiffs' total damages as a result of this breach of implied warranty of habitability to be $50,000. The Trial Court entered Judgment on the jury's verdict on June 7, 2011 finding and holding, *inter alia*, that "Defendants Danny Nicholson, Richard Lane and Alvin Butler were liable to the plaintiffs for the breach of Implied Warranty of Habitability in the amount of Fifty Thousand ($50,000.00) Dollars." Defendants filed a motion for new trial or in the alternative for remittitur. Plaintiffs filed a motion for new trial or in the alternative additur. The Trial Court denied both motions for new trial. Defendants appeal to this Court.[2]

## **Discussion**

Although not stated exactly as such, Defendants raise two issues on appeal: 1) whether the Trial Court erred in approving the jury's verdict; and, 2) whether the Trial Court erred in denying their motion for remittitur. Plaintiffs raise an issue about whether the Trial Court erred in denying their motion for new trial and specifically allege that the verdict is not supported by the evidence.

We first address whether the Trial Court erred in approving the jury's verdict. As our Supreme Court has instructed:

---

[2]Plaintiffs filed a notice of appeal on January 18, 2012. Plaintiffs subsequently filed a motion seeking to have their appeal voluntarily dismissed, which we granted by order entered March 5, 2012. Defendants then filed a motion seeking to have the appeal reinstated. We granted Defendants' motion and reinstated the appeal by order entered April 5, 2012.

An appellate court shall only set aside findings of fact by a jury in a civil matter if there is no material evidence to support the jury's verdict. Tenn. R. App. P. 13(d); *Whaley v. Perkins*, 197 S.W.3d 665, 671 (Tenn. 2006). In determining whether there is material evidence to support a verdict, we shall: "(1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence." *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704 (Tenn. 2000) (citing *Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn 1978)). "Appellate courts shall neither reweigh the evidence nor decide where the preponderance of the evidence lies." *Barnes*, 48 S.W.3d at 704. If there is any material evidence to support the verdict, we must affirm it; otherwise, the parties would be deprived of their constitutional right to trial by jury. *Crabtree Masonry Co.*, 575 S.W.2d at 5.

*Creech v. Addington*, 281 S.W.3d 363, 372 (Tenn. 2009).

Defendants argue in their brief on appeal that the Trial Court erred in approving the verdict because "no evidence was presented at trial that the cost of repair, which is the measure of damages in this case, is greater than $16,630.00." Defendants are mistaken. Mr. Carter testified that it was his opinion that the least expensive way to fix the problems with the House properly would be to tear it down and rebuild it. He testified that the cost to do this, taking into account the existing fixtures in the House, would be $335,643. The fact that upon vigorous cross-examination Mr. Carter admitted that a number of the problems with the House could be repaired for approximately $16,330 does not invalidate the fact that the jury was presented with material evidence that the cost to repair the House would be $335,643. Furthermore, Mr. Carter also testified that the repairs that could be done for $16,330 would not correct all of the problems detailed in Mr. Falconnier's report and would only be "a patch and a fix."

What Defendants are asking this Court to do is reweigh the evidence to determine where the preponderance lies. This we must not, and will not do. The jury made an award of damages within the reasonable range of damages presented at trial, and the record contains material evidence in support of the jury's verdict.

Next we address whether the Trial Court erred in denying Defendants' motion for remittitur. We are reviewing a jury verdict that has been approved by the Trial Court. Our standard of review on this issue is whether there is any material evidence to support the amount of the verdict. "This review questions 'whether material evidence can be found in the record that would support an award . . . [as being within] the range of reasonableness,

giving full faith and credit to all of the evidence that tends to support that amount.'" *Smartt v. NHC Healthcare/McMinnville, LLC*, No. M2007-02026-COA-R3-CV, 2009 WL 482475, at * 20 (Tenn. Ct. App. Feb. 24, 2009), *Rule 11 appl. perm. appeal denied March 10, 2011,* (quoting *Poole v. Kroger Co.*, 604 S.W.2d 52, 54 (Tenn.1980)). "[A] finding of excessiveness necessarily involves a determination of the dollar figure that represents the point at which excessiveness begins, and that figure is the upper limit of the range of reasonableness." *Smartt*, 2009 WL 482475, at * 21 (quoting *Ellis v. White Freightliner Corp.*, 603 S.W.2d 125, 129 (Tenn. 1980)). As this Court stated in *Duran v. Hyundai Motor America, Inc.*, 271 S.W.3d 178 (Tenn. Ct. App. 2008):

> The amount of a verdict alone can be so large that it reflects passion, prejudice, or caprice. *Am. Lead Pencil Co. v. Davis*, 108 Tenn. 251, 258, 66 S.W. 1129, 1130 (1901). However, the appellate courts may step in and invalidate a judgment based on a jury's verdict only when there is no material evidence to support the verdict, *McCullough v. Johnson Freight Lines, Inc.*, 202 Tenn. 596, 604, 308 S.W.2d 387, 391 (1957), or when the amount of the verdict is so excessive or unconscionable that it shocks the judicial conscience and amounts to a palpable injustice, *Johnson v. Woman's Hosp.*, 527 S.W.2d 133, 142-43 (Tenn. Ct. App. 1975); *Harrison v. Wilkerson*, 56 Tenn. App. 188, 196, 405 S.W.2d 649, 652-53 (1966).

> * * *

> When the conduct of a jury is challenged, the appellate courts begin with a presumption that juries are honest and conscientious and they have followed the instructions given to them. *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004); *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998).

*Duran*, 271 S.W.3d at 212 (footnote omitted).

The record on appeal contains material evidence in support of the jury's verdict which, as discussed above, was within the reasonable range of damages presented at trial. Furthermore, after carefully and thoroughly reviewing the record we cannot say that "the amount of the verdict is so excessive or unconscionable that it shocks the judicial conscience and amounts to a palpable injustice …." *Id.* As discussed above, there is material evidence in the record that the cost to repair the House properly would be $335,643. As such, the jury's award of $50,000 in damages falls far short of the upper limit of the range of reasonableness. Given all this, we find no error in the Trial Court's denial of Defendants' motion for remittitur.

Finally, we consider Plaintiffs' issue. As pertinent to this issue, this Court discussed in *GSB Contractors, Inc. v. Hess*:

> *Generally*, the measure of damages will be the cost or repair *unless* the repairs are not feasible or the cost is disproportionate to the dimunition in value." *Radant v. Earwood*, No. 02A01-9802-CV-00029, 1999 WL 418339, at *8, 1999 Tenn. App. LEXIS 390, at *20 (Tenn. Ct. App. June 22, 1999) (emphasis added); *see also Estate of Jessee v. White*, 633 S.W.2d 767, 769 (Tenn. Ct. App. 1982). When selecting the appropriate measure of damages applicable in this case, we are mindful of the following:
>
> > As a general rule, the measure of damages for defects and omissions in the performance of a construction contract is the reasonable cost of the required repairs. *Estate of Jessee v. White*, 633 S.W.2d 767 (Tenn. App. 1982). This is especially true when the structure involved is the owner's home. *Edenfield v. Woodlawn Manor, Inc.*, 62 Tenn. App. 280, 462 S.W.2d 237 (1970). However, in the event that the cost of repairs is disproportionate when compared with the difference in value of the structure actually constructed and the one contracted for, the diminution value may be used instead as the measure of damages. *Redbud Cooperative Corporation v. Clayton*, 700 S.W.2d 551 (Tenn. App. 1985).
>
> *Nutzell v. Godwin*, No. 33, 1989 Tenn. App. LEXIS 485, at *2-3 (Tenn. Ct. App. July 13, 1989) (emphasis added).

*GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 542 (Tenn. Ct. App. 2005).

Plaintiffs argue in their brief on appeal that because the evidence regarding the cost to repair spanned from approximately $16,000 to over $300,000, the proper measure of damages should have been the diminution of value as testified to by Mr. Bowley. Specifically, Mr. Bowley testified that the House was worth only about $75,000, but that if it had been properly constructed it would have been worth $350,000. Plaintiffs argue that damages should have been awarded based upon this evidence in the amount of $275,000. What Plaintiffs fail to recognize, however, is the fact that the evidence also shows that Plaintiffs purchased the House and the land upon which it sits for $165,000 less than seven years prior to trial. It stretches credibility to state that Plaintiffs should recover damages in this case of $275,000 when the House and land cost them only $165,000. The jury was free to chose to credit or to discredit Mr. Bowley's testimony with regard to diminution of value,

-13-

and to chose to credit the testimony regarding the cost of repair damages. We find no error in the award of damages in this case for the reasonable cost of repairs as found by the jury.

Furthermore, as discussed above there is material evidence in the record to support the jury's verdict, which is within the range of reasonableness. Plaintiffs, like Defendants, seek to have this Court reweigh the evidence to decide where the preponderance lies. This we must not, and will not do. Plaintiffs assert that the damage award does "not comport with the proof adduced at trial …." We disagree with Plaintiffs for all of the reasons already discussed, and we find no error in the Trial Court's approval of the jury's verdict or the Trial Court's denial of Plaintiffs' motion for new trial or in the alternative for additur.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed one-half against the appellants, Richard Lane, Alvin Butler, and Danny Nicholson, and their surety; and one-half against the appellees, James M. Bowley and Barbara A. Bowley.

_____
D. MICHAEL SWINEY, JUDGE